**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NEXTPULSE, LLC,<br><br>                    Plaintiff,<br><br>     v.<br><br>LIFE FITNESS, LLC, KPS CAPITAL<br>PARTNERS, LP, and LUMOS PRIVATE<br>HOLDINGS, B.V.,<br><br>              Defendants. | Civil Action No.: 1:22-cv-3239<br><br>Judge Manish S. Shah<br><br>**JURY TRIAL DEMANDED** |

### NEXTPULSE, LLC'S AMENDED COMPLAINT

Plaintiff NEXTPULSE, LLC, for its claims against Defendants LIFE FITNESS, LLC, KPS CAPITAL PARTNERS, LP, and LUMOS PRIVATE HOLDINGS, B.V., alleges as follows:

### THE PARTIES

1.      NEXTPULSE, LLC ("NP") is a Delaware limited liability company with its principal place of business located in the Town of Atherton, County of San Mateo, and State of California.

2.      NP is informed and believes, and thereon alleges, that Defendant LIFE FITNESS, LLC ("LF") is a Delaware limited liability company registered to do business in Illinois, with its principal place of business located in the City of Franklin Park, County of Cook, and State of Illinois.

3.      NP is informed and believes, and thereon alleges, that Defendant KPS Capital Partners, LP ("KPS") is a New York limited partnership, with its principal place of business located in New York.

1

4.     NP is informed and believes, and thereon alleges, that Defendant Lumos Private Holdings, B.V. ("Lumos") is a private limited liability company and an affiliate of KPS, with its principal place of business in Amsterdam. LF, KPS and Lumos are collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the first claim alleged herein (copyright infringement under the federal copyright laws) pursuant to 17 U.S.C. Section 501 and 28 U.S.C. Sections 1331 and 1338(a) in that said claim arises under the laws of the United States.

6.     This Court has subject matter jurisdiction over the second claim alleged herein (tortious interference with contractual rights) pursuant to 28 U.S.C. Section 1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000, and pursuant to 28 U.S.C. Section 1367, because the claim is related to other claims in this action that are within the Court's original jurisdiction.

7.     This Court has subject matter jurisdiction over the third claim alleged herein (trade secret misappropriation under the federal Defend Trade Secrets Act) pursuant to 28 U.S.C. Sections 1836-39 *et seq.* and 28 U.S.C. Section 1331.

8.     NP's claims arise in whole or in part in this District.  LF operates in, resides in, and/or exists in this District. Accordingly, pursuant to 28 U.S.C. Sections 1391(b) and 1400(a), venue is proper in this District.

## SUMMARY OF THE FACTS

9.     Netpulse, Inc. ("Netpulse"), the predecessor of NP, was a Delaware corporation duly licensed and qualified to do business in California and had its principal

place of business in San Francisco, California. Netpulse developed software applications, content delivery systems, and network-based services related to exercise equipment.

10. In 2011, Virtual Active, Inc. ("VA") was a San Francisco based media and technology company that developed video content specifically targeted to entertain and motivate cardio fitness equipment users ("VA Content").

11. In 2011, Life Fitness was a division of Brunswick Corporation ("BC"). BC's Life Fitness division designed, manufactured, marketed, and sold fitness equipment products, including cardio exercise equipment such as treadmills, exercise bicycles, and elliptical machines.

12. In 2011, BC's Life Fitness division and Netpulse each made separate offers to purchase VA. Netpulse's offer was accepted and in October of 2011, Netpulse acquired VA, including its intellectual property rights to the VA Content, such as copyrights to its video library.

13. Netpulse developed an entertainment and advertising platform for exercise equipment and wanted to partner with BC, the largest manufacturer of commercial health club equipment, to incorporate Netpulse's platform on BC's Life Fitness consoles (*i.e.,* screens) featured on BC's cardio fitness equipment products (*e.g.,* its treadmills, exercise bicycles, and elliptical machines). Based on Netpulse's prior experience selling advertising on consoles, the volume of BC's cardio equipment sales, and the significant usage by health club members of cardio exercise equipment, Netpulse knew that its advertising platform would generate significant recurring income for Netpulse. Knowing that BC had wanted the VA Content for its exercise consoles, Netpulse offered to license the VA Content to BC in exchange for BC's agreement to put Netpulse's entertainment

3

and advertising platform on BC's Life Fitness consoles.

14.    Netpulse and BC entered into a written Customized Development and Software Licensing Agreement, effective December 12, 2011, and several amendments thereto, specifically a First Amendment, effective March 12, 2012, a Second Amendment, effective September 26, 2012, and a Third Amendment, effective February 13, 2014. Netpulse and BC were each required to perform various obligations under the Customized Development and Software Licensing Agreement and the amendments thereto (collectively, "SLA").

15.    Netpulse and BC also entered into the following agreements effective July 30, 2015: a Virtual Active License Agreement ("VALA") and an Advertising Services Agreement ("ASA") (collectively, the "2015 Contracts").

16.    Pursuant to the SLA and the 2015 Contracts (the "Contracts"), Netpulse provided BC with significant technology, including source code, executable code, videos, and other intellectual property. This included the "Netpulse Interface," as defined in the Contracts, a touchscreen interface designed to work with BC's equipment and that controlled the Netpulse entertainment platform and enabled content display and network connectivity. Netpulse also provided various VA materials, as further described and defined in the Contracts, including a library of VA videos designed to be used in conjunction with the Netpulse Interface and BC's fitness equipment.  This technology, the related intellectual property, and the videos, as further described in the Contracts, are referred to herein as the "Netpulse Technology." The Netpulse Technology was provided to BC subject to constraints and limitations, as provided under the Contracts.

17.    In conjunction with the Netpulse Technology, Netpulse provided BC with extensive confidential information, including but not limited to development information;

4

details regarding the Netpulse Interface; detailed information regarding the VA library of videos and how to interface with them; communications (such as emails) containing technology details; testing data; computer software information (including developer notes, revisions, corrections, bug fixes, and related information); sales and marketing information; ideas, concepts, methodologies; and solutions relating to the interfaces and connections allowing for effective operation and incorporation of the VA videos and interactive features into consoles and machines, collectively referred to herein as the "Netpulse Confidential Information." The Netpulse Confidential Information was provided to BC under the confidentiality provisions of the SLA, VALA, and ASA.

18. Under the SLA, Netpulse granted BC a "non-exclusive, non-sublicensable, non-transferable – right and license" to the Netpulse Code, including the VA Programs, as those terms were defined in the SLA; an "exclusive, non-sublicensable, non-transferable right and license" to manufacture, sell, and distribute certain equipment with the Netpulse attachable personal viewing screen and VA Programs, as defined in the SLA, with interactivity and additional features; and a perpetual, non-sublicensable, non-transferable license to make internal copies of, incorporate, and distribute the object code version of the Life Fitness Interface, as further described in the SLA.

19. Under the SLA, each party retained all right, title, and interest in its intellectual property. The SLA also allowed each party to use the other party's confidential information only as authorized. Upon termination, all licenses granted under the SLA were to terminate, BC was to cease manufacturing products under the agreement and within 6 months BC was to cease all marketing and offering for sale of such products. However, even after termination of the SLA, certain terms, including the confidentiality clause, survived.

5

20.     Under the SLA, "neither party may assign any rights or delegate any duties … without the other party's prior written consent, and any attempt to do so without that consent will be void," except in certain specifically permitted circumstances.  BC was only permitted to assign the SLA to a "surviving entity in a merger or consolidation in which [BC] participates or to a purchaser of all of substantially all of [BC's] assets."

21.     Under the VALA, Netpulse granted BC "an unlimited, perpetual, nontransferable, non-sublicensable and nonassignable license" to integrate certain VA products into BC's exercise equipment, to make certain VA courses available via BC's consoles, and to use and distribute updates to its customers. BC was not permitted to "sublicense Licensed Software [as defined in the VALA] to any third party, or otherwise cause any third party to use the Licensed Software in any way other than in [BC's] own consoles without prior written approval of Netpulse."

22.     The VALA also allowed each party "to use the other party's Confidential Information only as authorized." The "Confidential Information" described in the VALA included, *inter alia,* the Licensed Software and the parties' research and development. Upon termination, all licenses granted under the VALA were to terminate and BC was to cease all marketing, offering for sale, etc., of its products with the Licensed Software. Even if the VALA were terminated, certain terms including the confidentiality clause survived termination.

23.     Under the VALA "neither party may assign any rights or delegate any duties … without the other party's prior written consent, and any attempt to do so without that consent will be void," except in certain specifically permitted circumstances not applicable here. BC was only permitted to assign the VALA to a "surviving entity in a merger or consolidation in which [BC] participates or to a purchaser of all of

6

substantially all of [BC's] assets."

24.     Under the ASA, Netpulse granted BC "a limited, non-exclusive, non-transferable license to use the applicable Netpulse Software solely in accordance with the instructions provided to [BC] by Netpulse and for the sole purposes of receipt of the Advertising Services [as defined in the ASA]." BC was not permitted to otherwise use the Netpulse Software, as defined in the ASA, nor to modify, reverse engineer, create derivative works, sublicense, assign, or otherwise use the Netpulse Software in any way not permitted under the ASA. Netpulse retained all rights and title to the Netpulse Software and all intellectual property rights contained therein and associated therewith.

25.     The ASA also required each party to use the other party's "Confidential Information" only as authorized. The "Confidential Information" described under the ASA included, *inter alia,* the Advertising Service (as defined in the ASA) and the parties' research and development. Upon termination, all licenses granted under the ASA were to terminate. Even if the ASA were terminated, certain terms including the confidentiality clause survived termination.

26.     Under the ASA "neither party may assign any rights or delegate any duties … without the other party's prior written consent, and any attempt to do so without that consent will be void," except in certain specifically permitted circumstances. BC was only permitted to assign the ASA to a "surviving entity in a merger or consolidation in which it participates or to a purchaser of all of substantially all of its assets."

27.     Netpulse performed all of its obligations under the SLA, VALA, and ASA, except those that it was excused from performing. Netpulse's performance included providing BC with software, in both source code and executable code forms; providing confidential information, including confidential research, development,

7

analysis, and testing; and providing various VA content, including VA videos.

28.     BC failed to meet its obligations under the SLA, VALA, and ASA by, *inter alia,* failing to enable Netpulse's advertising software on BC's consoles and taking unearned and fraudulent rebates. Effective at latest by 30 days after the filing of the California Litigation referenced in paragraph 30 below, if not earlier, the SLA, VALA, and ASA were terminated as a result of BC's breaches of its obligations under each of those agreements.  However, even though the SLA, VALA, and ASA were terminated, BC remained obligated to comply with many terms under the agreements, including the confidentiality obligations set forth in each agreement.

29.     On or about May 4, 2018, in connection with a tax-free reorganization pursuant to Section 368(a)(1)(C) of the Internal Revenue Code, Netpulse was merged into Nextpulse, LLC ("NP"), and thereupon NP became Netpulse's successor in interest.

30.     On November 2, 2018, NP filed a lawsuit against BC in the Superior Court of California, in and for the County of San Francisco (the "California Litigation"). The California Litigation includes causes of action for Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Fraud, and Misappropriation of Trade Secrets relating to the actions associated with the SLA, VALA, ASA, and other agreements between Netpulse and BC. BC also brought cross-claims. The California Litigation remains pending. While the SLA was found to have been novated by the 2015 Contracts in the California Litigation, that decision is not yet a final decision since the case remains pending.

31.     At some point, which NP believes to have been in approximately 2018, KPS engaged in negotiations to potentially acquire BC's Life Fitness Division. Based

on information and belief, NP alleges that KPS engaged in due diligence during the course of its negotiations with BC and, among other things, learned of the existence of the SLA, VALA, and ASA and evaluated those agreements as part of the due diligence process.

32.     On information and belief NP alleges that, in December of 2018, BC did an internal reorganization pursuant to which it created a wholly owned subsidiary of BC known as Life Fitness, LLC.

33.     NP is informed and believes, and on that basis alleges, that KPS created Lumos as an affiliate so that Lumos could be the acquiring entity of Life Fitness, LLC. NP is informed and believes, and on that basis alleges, that at some point Lumos also became involved in the negotiations and due diligence process with BC in connection with the purchase of BC's fitness business, including its wholly owned subsidiary, Life Fitness, LLC.  As with KPS, NP is informed and believes, and on that basis alleges, that during the course of Lumos's negotiations with BC it learned, among other things, of the terms of the SLA, VALA, and ASA and evaluated those agreements as part of the due diligence process.

34.     On or about June 27, 2019, BC sold its entire fitness business (including its wholly owned subsidiary Life Fitness, LLC) to Lumos, an affiliate of KPS, a private investment firm, in an all-cash transaction for approximately $490 million. NP is not presently aware of the details of that transaction. As a result of that transaction, for the first time Life Fitness, LLC, became a legal entity that was no longer a wholly owned subsidiary of BC.  LF has never been a party to any of the Contracts and never had any rights under any of the Contracts.

35.     During the California Litigation, BC initially denied assigning or

9

transferring the Contracts or any rights thereunder to LF when or after LF became a separate legal entity. BC even stated under penalty of perjury that the Contracts were "not contemplated in the sale [of BC's fitness business, including Life Fitness, LLC], in part, because each of the contracts had either been novated, terminated, not-renewed, or expired." In the early part of 2022, NP learned for the first time that BC had in fact transferred to LF significant confidential information and intellectual property BC obtained from Netpulse or had rights to pursuant to the Contracts with Netpulse.

36.     After BC sold its fitness business, LF became a separate legal entity that was no longer owned by BC. LF was a third party that had no contractual rights under the Contracts and, pursuant to the explicit terms of each of the agreements, BC was not capable of assigning any rights under any of these agreements to LF without Netpulse's consent, which was never requested by BC nor ever given by Netpulse or NP.

37.     NP is informed and believes, and thereon alleges, that upon completion of the sale of LF by BC, BC transferred to LF all of the Netpulse Technology, Netpulse Confidential Information, and various forms of intellectual property Netpulse provided to BC during Netpulse's and BC's contractual relationship associated with the Contracts.

38.     NP is informed and believes, and thereon alleges, that upon completion of the sale of LF by BC on or about June 27, 2019, LF began using the Netpulse Technology and Netpulse Confidential Information, despite having no legal right to do so since BC had no right to transfer or assign any right or license to use such technology and confidential information. NP is informed and believes, and thereon alleges, that at all times relevant to this matter, LF has knowingly, deliberately, and willfully used, and threatens in the future to use, the Netpulse Technology and Netpulse Confidential Information without any right, license, or authorization to do so, in willful violation of

NP's rights.

39.     NP is informed and believes, and thereon alleges, that each of the Defendants was aware of the Contracts and the terms of those Contracts, including the fact that the rights under the Contracts could not be transferred or assigned, since many of the persons employed by LF were previously employed in BC's Life Fitness division and further since these Contracts certainly should have been reviewed and evaluated by Lumos and KPS during the due diligence process associated with the acquisition of LF.

40.     NP is informed and believes, and thereon alleges, that despite being well aware of the contractual terms prohibiting transfer or assignment and requiring confidential information to be kept confidential, Defendants intentionally interfered with the contractual relationship between Netpulse and BC, and induced BC to breach the Contracts by causing BC to illegally, and in breach of the agreements, transfer Netpulse's confidential and proprietary information to LF and/or violate the confidentiality clauses in those agreements.

41.     NP had ownership of certain trade secrets, copyrights, and other intellectual property described herein as a result of its predecessor in interest Netpulse's development of these rights and interests, while other rights were obtained as a result of acquisitions, transfers, or assignments.  In 2019, NP entered into a contract with VA and Forward Motion Partners LLC ("FMP") through which certain intellectual property was transferred to VA and/or FMP. Subsequently, in 2022, VA and FMP transferred ownership and rights to specified video content, to the extent such rights were held by VA and/or FMP, to NP. NP registered copyrights in certain VA videos and has ownership of those copyrights.

11

42.     NP owns and has title to registered copyrights in its computer software, as set forth in Exhibit A to this Amended Complaint.

43.     Based on the foregoing, NP is informed and believes, and thereon alleges, that LF has unlawfully used, reproduced, distributed, and/or made into a derivative work NP's copyrighted computer software, without authorization or right to do so, has infringed NP's valuable intellectual property rights, including its copyrighted computer software, and has threatened to, and will continue to, infringe NP's intellectual property rights unless restrained by this Court.

44.     NP owns and has title to registered copyrights in numerous VA videos, as set forth in Exhibit B to this Amended Complaint.

45.     Based on the foregoing, NP is informed and believes, and thereon alleges, that LF has unlawfully reproduced, distributed, publicly displayed, and/or created derivative works of NP's copyrighted VA videos, without authorization or right to do so, has infringed NP's valuable intellectual property rights, including its copyrighted videos, and has threatened to, and will continue to, infringe NP's intellectual property rights unless restrained by this Court.

46.     At all times herein relevant, NP has complied in all respects with the Copyright Act, 17 U.S.C. Sections 101, *et seq*., to secure the exclusive rights and privileges in and to the copyrights in the NP computer software and videos referenced herein. The NP computer software and the videos set forth in Exhibits A and B that are the subject of this Amended Complaint consist of original works of authorship that are copyrightable under the Copyright Act. Copyrights in this computer software and these videos have been registered in full compliance with the Copyright Act, and NP has received certificates of registration from the Registrar of Copyrights for them. NP is the

owner of all rights, title, and interest to said federal copyright registrations.

47.     LF's reproduction, distribution, public display, and/or creation of derivative works of NP's copyrighted computer software and videos is without permission or valid license. No legitimate basis exists for LF's unauthorized use of NP's copyrighted computer software and videos.

48.     NP seeks through this Amended Complaint to obtain preliminary and permanent injunctive relief enjoining LF, its affiliates, officers, directors, employees, agents, representatives, and all persons in active concert or participation with any of them from the unauthorized use and/or copying of NP's computer software and related documentation. NP further seeks monetary relief, including damages actually sustained by NP and/or statutory damages, and attorneys' fees and costs in this action, pursuant to 17 U.S.C. Section 502 *et seq.*, and all other relief to which NP may be entitled.

49.     NP is informed and believes, and thereon alleges, that LF continues to use the NP computer software and videos knowingly, deliberately, and willfully, without any right, license, or authorization to do so, and, as a result, is deliberately and willfully infringing NP's valid copyrights in said software and videos.

## **FIRST CLAIM FOR RELIEF**

### **(For Copyright Infringement Against LF)**

50.     NP realleges and incorporates herein, as if set forth in full, the allegations of Paragraphs 1 through 49, inclusive, of this Amended Complaint.

51.     In this action NP is asserting a claim against LF for copyright infringement under the federal Copyright Act, 17 U.S.C. Sections 106 *et seq*. NP is seeking injunctive relief, restitution, damages (actual and/or statutory, if applicable) and attorneys' fees as permitted by federal law.

13

52.     LF's acts constitute infringement of NP's copyrights in the NP software and videos identified in Exhibits A and B in violation of the Copyright Act, 17 U.S.C. Sections 101 *et seq*.

53.     NP is informed and believes, and thereon alleges, that LF's infringement of the copyrights in the NP computer software and videos was, and continues to be, deliberate and willful and without regard to NP's rights.

54.     LF's copyright infringement has caused, and will continue to cause, NP to suffer substantial injuries, loss, and damage to its proprietary and exclusive rights to, and copyrights in, the NP computer software and videos and, further, has damaged NP's business, reputation, and goodwill, diverted trade, and caused a loss of profits, all in an amount not yet ascertained but to be proven at trial.

55.     LF's copyright infringement and the threat of continuing infringement have caused, and will continue to cause, NP repeated and irreparable injury. It is difficult to ascertain the amount of money damages that would afford NP adequate relief at law for LF's continuing acts, and a multiplicity of judicial proceedings could be required to address the same. Accordingly, NP's remedy at law is inadequate to compensate it for the injuries threatened and inflicted by LF, and LF should be restrained and enjoined, both preliminarily and permanently, pursuant to the appropriate provisions of the Copyright Act, 17 U.S.C. Section 502.

## **SECOND CLAIM FOR RELIEF**

**(For Tortious Interference with Contractual Rights**

**Against All Defendants)**

56.     NP realleges and incorporates herein, as if set forth in full, the allegations

of Paragraphs 1 through 55, inclusive, of this Amended Complaint.

57.     As set forth in detail above, Netpulse and BC entered into valid and enforceable Contracts, to wit, the SLA, VALA, and ASA. Plaintiff NP is the successor in interest to Netpulse and has the right to pursue causes of action based on these Contracts. None of the Defendants were ever parties to any of the Contracts.

58.     When LF became a separate legal entity but a wholly owned subsidiary of BC in December 2018, it had knowledge of the Contracts. LF also knew of the Contracts in that many of LF's employees, officers, and board members were employed by BC during the negotiation of the Contracts and/or when Netpulse and BC were complying with or working toward compliance with the terms of the Contracts.

59.     As alleged above, based on information and belief, Lumos and KPS became aware of the terms of the Contracts as a result of the due diligence process in connection with their purchase of BC's fitness division, which included BC's wholly owned subsidiary, Life Fitness, LLC.

60.     Defendants intentionally and unjustifiably induced BC to breach the Contracts by illegally and intentionally persuading, encouraging, or inciting BC to assign and/or transfer rights, intellectual property, and/or confidential information to LF, including but not limited to providing access to confidential information, intellectual property, computer software, and videos that were only available to BC under the Contracts, and that were not assignable or transferrable. Such confidential information, intellectual property, computer software, and videos were valuable and were an important part of the property transferred as part of the sale of the resulting separate business entity.

15

61.     The wrongful conduct of Defendants, including the transfers and/or assignments referenced above, the illegal use of confidential information set forth above, and the infringement of NP's copyrights, was the cause or a significant factor in BC's breach of these agreements.

62.     As a result of Defendants' wrongful conduct, NP has suffered damages, consisting of at least loss of licensing revenue and loss of opportunities to engage in a license agreement through which NP should have received revenue.  Additionally, Defendants benefitted by receiving far more than they were entitled to receive in LF as a separate entity from BC. Defendants benefitted and were unjustly enriched by their illegal acts, to the detriment of NP. This has caused significant damage to NP in an amount to be proven in trial.

## THIRD CLAIM FOR RELIEF

**(For Trade Secret Misappropriation under the Federal**

**Defend Trade Secrets Act Against LF)**

63.     NP realleges and incorporates herein, as if set forth in full, the allegations of Paragraphs 1 through 62, inclusive, of this Amended Complaint.

64.     Pursuant to the Contracts, Netpulse provided BC with certain Netpulse Technology that was confidential and subject to strict limitations on its disclosure, transfer, and use, including computer software (both object code and source code). Additionally, Netpulse provided BC with the Netpulse Confidential Information, defined above, as well as all of the confidential information identified and defined under the Contracts. The Netpulse Technology, the Netpulse Confidential Information, and the confidential information identified and defined under the Contracts are collectively referred to as the Netpulse Trade Secrets. The Netpulse Trade Secrets were provided to

BC under the confidentiality terms and pursuant to other limitations in the Contracts.

65.     The Netpulse Trade Secrets derive independent economic value, actual and potential, from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use. Netpulse spent many thousands of hours of employee and contractor time and related costs to develop the Netpulse Trade Secrets. If the Netpulse Trade Secrets were available to the general public or other companies in this field, it would sharply decrease the value of these trade secrets to NP.

66.     NP and its predecessor in interest, Netpulse, have taken efforts that are reasonable under the circumstances to maintain the secrecy of the Netpulse Trade Secrets, including but not limited to requiring confidentiality clauses and strict limitations on disclosure in the agreements with BC. The Netpulse Trade Secrets relate to a product and were incorporated into a product used in, or intended for use in, interstate commerce.

67.     Each agreement alleged herein that was entered into by Netpulse and BC contained a confidentiality clause that required BC to maintain the Netpulse Trade Secrets in strict confidence. LF was familiar with these terms of the Contracts and knew that the Netpulse Trade Secrets were to be held in strict confidence.

68.     LF misappropriated the Netpulse Trade Secrets by taking possession custody, and control of the Netpulse Trade Secrets; using the Netpulse Trade Secrets to develop, create, and market its own software; and more easily developing, enhancing, testing, and implementing similar software, solutions, and capabilities based on information from the Netpulse Trade Secrets. BC and LF have admitted in the California Litigation that BC no longer has possession, custody, and control of the code repositories containing the computer software, the engineering notes, testing details, and other highly confidential Netpulse Trade Secrets because all of that information was transferred to LF.

17

69.     NP is informed and believes, and thereupon alleges, that LF has incorporated the Netpulse Trade Secrets into LF's products which it sells in interstate commerce. LF has and continues to this date to use the Netpulse Trade Secrets to allow running of software and providing of support for products, *inter alia,* in interstate commerce.

70.     This misappropriation by LF was made in bad faith and was willful and malicious because LF knew it had no rights to the Netpulse Trade Secrets. LF participated in the transfer of the Netpulse Trade Secrets and then used the Netpulse Trade Secrets in order to more easily succeed as a separate entity after it was divested from BC. LF's use of the Netpulse Trade Secrets was without authorization and was for LF's own commercial gain.

71.     As a result of this misappropriation of the Netpulse Trade Secrets by LF, NP has suffered damages, and LF has been unjustly enriched and has profited. Accordingly, NP has suffered damages in an amount to be proven at trial.

72.     As a direct and proximate result of LF's continued misappropriation of the Netpulse Trade Secrets, NP will suffer imminent and irreparable harm. Unless enjoined by this Court, LF's acts of misappropriation will continue, and NP will continue to suffer irreparable harm. Plaintiff has no adequate remedy at law and is entitled to an injunction under 18 U.S.C. § 1836(b)(3)(A).

73.     On information and belief, LF's continued unauthorized use of the Netpulse Trade Secrets is willful and malicious, based on the allegations set forth above. LF was aware it had no rights under the Contracts and could not use any of the Netpulse Trade Secrets when it was no longer part of BC. It engaged in willful and intentional acts of misappropriation, and further attempted to mislead NP as to the true facts of the

misappropriation. Plaintiff is entitled to recover enhanced damages and its reasonable attorneys' fees under 18 U.S.C. §§ 1836(b)(3).

WHEREFORE, NP prays for relief as set forth herein.

## RELIEF REQUESTED

Plaintiff Nextpulse prays that this Court enter judgment in its favor on its claims set forth above and award it relief, including, but not limited to, the following:

A. Ordering a preliminary injunction enjoining and restraining LF and its respective affiliates, officers, directors, employees, agents, servants, representatives, successors and assigns, and all persons in active concert or participation with LF, from:

(1) Copying, reproducing, duplicating, or using the NP copyrighted material, or any copies thereof, or any related documentation; or,

(2) Otherwise infringing any of NP's copyrights;

B. That the Court issue a permanent injunction, making permanent the orders requested in paragraphs (A)(1) and (A)(2) above;

C. That NP be awarded, on account of LF's willful copyright infringement to date, either: (1) actual damages and/or restitution in an amount to be determined at trial; or (2) statutory damages (if applicable) for each act of infringement in an amount provided by law, including an increase in the award of statutory damages to a sum of not more than $150,000 for each infringement, as set forth in 17 U.S.C. Section 504, as may be permitted by law and according to NP's election before entry of a final judgment;

D. That the Court issue an order requiring LF to file with this Court and serve on NP, within not more than thirty (30) days after service of the injunction, a written report, under oath, setting forth in detail the manner and form in which LF has complied with said injunction;

19

E.      That the Court order LF to destroy all infringing copies of NP's copyrighted material;

F.      That NP be awarded actual damages according to proof resulting from Defendants' tortious interference with contractual rights, including at least the benefit NP would have received but for Defendants' wrongful interference;

G.      That NP be awarded punitive damages based on LF's willful, intentional interference with the contractual relations between Netpulse and BC and, if deemed appropriate, attorneys' fees;

H.      That NP be awarded actual damages according to proof resulting from LF's misappropriation of trade secrets, including but not limited to damages necessary to compensate NP for the damage caused by LF's misappropriation;

I.      That the Court issue an order requiring LF to return and/or destroy all trade secret materials that remain in its possession, custody, and control and file with this Court and serve on NP, within not more than thirty (30) days after service of the injunction, a written report, under oath, setting forth in detail the manner and form in which LF has complied with said injunction;

J.      That the Court order LF to destroy all misappropriated copies of the Netpulse Trade Secrets;

K.      That NP be awarded punitive damages based on LF's willful, intentional misappropriation of trade secrets and, if deemed appropriate, attorneys' fees;

L.      For costs of suit herein; and,

M.      For such other and further relief as the Court may deem just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: September 2, 2022            Respectfully submitted,

Sara Tonnies Horton (shorton@willkie.com)      **NEXTPULSE, LLC**
Michael G. Babbitt (mbabbitt@willkie.com)
Skyler J. Silvertrust (ssilvertrust@willkie.com)    By:    /s/ *Sara Tonnies Horton*
Willkie Farr & Gallagher LLP                              Sara Tonnies Horton
300 North LaSalle Dr.
Chicago, IL 60654-3406
(312) 728-9000


E. David Marks (dmarks@gcalaw.com)
Kathryn C. Curry (kcurry@gcalaw.com)
Kimberly A. Donovan (kdonovan@gcalaw.com)
GCA Law Partners LLP
2570 W. El Camino Real, Suite 400
Mountain View, CA 94040
(650) 428-3900
*Admitted Pro Hac Vice*