**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NEXTPULSE, LLC, | Civil Action No. 1:22-CV-03239 |
| Plaintiff, | |
| v. | Judge Nancy L. Maldonado |
| LIFE FITNESS, LLC, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## <u>DEFENDANT LIFE FITNESS'S ANSWER AND AFFIRMATIVE DEFENSES TO NEXTPULSE, LLC'S AMENDED COMPLAINT (CORRECTED)</u>

Defendant Life Fitness, LLC ("Defendant" or "Life Fitness"), by and through their undersigned counsel, hereby submit its answer and affirmative defenses to Plaintiff Nextpulse, LLC's ("Plaintiff" or "Nextpulse") Amended Complaint (Corrected).

## <u>THE PARTIES</u>

1.     NEXTPULSE, LLC ("NP") is a Delaware limited liability company with its principal place of business located in the Town of Atherton, County of San Mateo, and State of California.

**ANSWER:**    Life Fitness is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

2.     NP is informed and believes, and thereon alleges, that Defendant LIFE FITNESS, LLC ("LF") is a Delaware limited liability company registered to do business in Illinois, with its principal place of business located in the City of Franklin Park, County of Cook, and State of Illinois.

**ANSWER:**    Admitted.

3.      NP is informed and believes, and thereon alleges, that Defendant KPS Capital Partners, LP ("KPS") is a New York limited partnership, with its principal place of business located in New York.

**ANSWER:**      The allegations of this paragraph require no response as the Court dismissed all claims against KPS.  Dkt. No. 89.

4.      NP is informed and believes, and thereon alleges, that Defendant Lumos International Holdings, B.V. ("Lumos") is a private limited liability company and an affiliate of KPS, with its principal place of business in Amsterdam. LF, KPS and Lumos are collectively referred to herein as "Defendants."

**ANSWER:**      The allegations of this paragraph require no response as the Court dismissed all claims against Lumos.  Dkt. No. 89.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the first claim alleged herein (copyright infringement under the federal copyright laws) pursuant to 17 U.S.C. Section 501 and 28 U.S.C. Sections 1331 and 1338(a) in that said claim arises under the laws of the United States.

**ANSWER:**      Life Fitness admits that the Amended Complaint purports to be an action for copyright infringement.  Life Fitness denies the remaining allegations in this paragraph.

6.      This Court has subject matter jurisdiction over the second claim alleged herein (tortious interference with contractual rights) pursuant to 28 U.S.C. Section 1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000, and pursuant to 28 U.S.C. Section 1367, because the claim is related to other claims in this action that are within the Court's original jurisdiction.

**ANSWER:**      The allegations of this paragraph require no response as the Court dismissed all of Nextpulse's tortious interference claims.  Dkt. No. 89.

7.      This Court has subject matter jurisdiction over the third claim alleged herein (trade secret misappropriation under the federal Defend Trade Secrets Act) pursuant to 28 U.S.C. Sections 1836-39 et seq. and 28 U.S.C. Section 1331.

**ANSWER:**      Life Fitness admits that the Amended Complaint purports to be an action for trade secret misappropriation.  Life Fitness denies the remaining allegations in this paragraph.

8.    NP's claims arise in whole or in part in this District. LF operates in, resides in, and/or exists in this District. Accordingly, pursuant to 28 U.S.C. Sections 1391(b) and 1400(a), venue is proper in this District.

**ANSWER:**    Life Fitness admits that it resides and operates in this District.  Life Fitness

denies the remaining allegations in this paragraph.

## SUMMARY OF THE FACTS

9.    Netpulse, Inc. ("Netpulse"), the predecessor of NP, was a Delaware corporation duly licensed and qualified to do business in California and had its principal place of business in San Francisco, California. Netpulse developed software applications, content delivery systems, and network-based services related to exercise equipment.

**ANSWER:**    Life Fitness is without knowledge or information sufficient to form a belief

as to the truth of the allegations of this paragraph, and therefore denies them.

10.    In 2011, Virtual Active, Inc. ("VA") was a San Francisco based media and technology company that developed video content specifically targeted to entertain and motivate cardio fitness equipment users ("VA Content").

**ANSWER:**    Life Fitness is without knowledge or information sufficient to form a belief

as to the truth of the allegations of this paragraph, and therefore denies them.

11.    In 2011, Life Fitness was a division of Brunswick Corporation ("BC"). BC's Life Fitness division designed, manufactured, marketed, and sold fitness equipment products, including cardio exercise equipment such as treadmills, exercise bicycles, and elliptical machines.

**ANSWER:**    Admitted that the Life Fitness Division of Brunswick Corporation ("Life

Fitness Division") designed, manufactured, marketed, and sold fitness equipment in 2011.  Denied

as to the remainder of this paragraph.

12.    In 2011, BC's Life Fitness division and Netpulse each made separate offers to purchase VA. Netpulse's offer was accepted and in October of 2011, Netpulse acquired VA, including its intellectual property rights to the VA Content, such as copyrights to its video library.

**ANSWER:**    Life Fitness admits that the Life Fitness Division made an offer to purchase

VA.  Life Fitness is without knowledge or information sufficient to form a belief as to the truth of

the remainder of the allegations of this paragraph, and therefore denies them.

13.     Netpulse developed an entertainment and advertising platform for exercise equipment and wanted to partner with BC, the largest manufacturer of commercial health club equipment, to incorporate Netpulse's platform on BC's Life Fitness consoles (i.e., screens) featured on BC's cardio fitness equipment products (e.g., its treadmills, exercise bicycles, and elliptical machines).  Based on Netpulse's prior experience selling advertising on consoles, the volume of BC's cardio equipment sales, and the significant usage by health club members of cardio exercise equipment, Netpulse knew that its advertising platform would generate significant recurring income for Netpulse. Knowing that BC had wanted the VA Content for its exercise consoles, Netpulse offered to license the VA Content to BC in exchange for BC's agreement to put Netpulse's entertainment and advertising platform on BC's Life Fitness consoles.

**ANSWER:**     Life Fitness admits that Netpulse offered to license the video content from

Virtual Active, Inc. ("VA Content") to Life Fitness Division.  Life Fitness is without knowledge

or information sufficient to form a belief as to the truth of the remainder of the allegations of this

paragraph, and therefore denies them.

14.     Netpulse and BC entered into a written Customized Development and Software Licensing Agreement, effective December 12, 2011, and several amendments thereto, specifically a First Amendment, effective March 12, 2012, a Second Amendment, effective September 26, 2012, and a Third Amendment, effective February 13, 2014. Netpulse and BC were each required to perform various obligations under the Customized Development and Software Licensing Agreement and the amendments thereto (collectively, "SLA").

**ANSWER:**     Life Fitness admits that Netpulse and Life Fitness Division entered into a

written Customized Development and Software Licensing agreement and subsequent amendments

("SLA").  Denied as to the remainder of this paragraph.

15.     Netpulse and BC also entered into the following agreements effective July 30, 2015: a Virtual Active License Agreement ("VALA") and an Advertising Services Agreement ("ASA") (collectively, the "2015 Contracts").

**ANSWER:**     Life Fitness admits that Netpulse and Life Fitness Division entered into the

Virtual Active License Agreement ("VALA") and an Advertising Services Agreement ("ASA")

on July 30, 2015.  Denied as to the remainder of this paragraph.

16.     Pursuant to the SLA and the 2015 Contracts (the "Contracts"), Netpulse provided BC with significant technology, including source code, executable code, videos, and other intellectual property. This included the "Netpulse Interface," as defined in the Contracts, a touchscreen interface designed to work with BC's equipment and that controlled the Netpulse entertainment platform and enabled content display and network connectivity. Netpulse also

provided various VA materials, as further described and defined in the Contracts, including a library of VA videos designed to be used in conjunction with the Netpulse Interface and BC's fitness equipment. This technology, the related intellectual property, and the videos, as further described in the Contracts, are referred to herein as the "Netpulse Technology." The Netpulse Technology was provided to BC subject to constraints and limitations, as provided under the Contracts.

**ANSWER:** Life Fitness admits that Netpulse and Life Fitness Division entered into the SLA, VALA, and ASA. Life Fitness further admits that Netpulse provided certain technology to Life Fitness Division pursuant to the SLA, VALA, and ASA. Life Fitness denies the remaining allegations of this paragraph.

17. In conjunction with the Netpulse Technology, Netpulse provided BC with extensive confidential information, including but not limited to development information; details regarding the Netpulse Interface; detailed information regarding the VA library of videos and how to interface with them; communications (such as emails) containing technology details; testing data; computer software information (including developer notes, revisions, corrections, bug fixes, and related information); sales and marketing information; ideas, concepts, methodologies; and solutions relating to the interfaces and connections allowing for effective operation and incorporation of the VA videos and interactive features into consoles and machines, collectively referred to herein as the "Netpulse Confidential Information." The Netpulse Confidential Information was provided to BC under the confidentiality provisions of the SLA, VALA, and ASA.

**ANSWER:** Life Fitness admits that Netpulse provided technology, information, and Virtual Active videos to the Life Fitness Division. Denied as to the remainder of this paragraph.

18. Under the SLA, Netpulse granted BC a "non-exclusive, non-sublicensable, non-transferable – right and license" to the Netpulse Code, including the VA Programs, as those terms were defined in the SLA; an "exclusive, non-sublicensable, non- transferable right and license" to manufacture, sell, and distribute certain equipment with the Netpulse attachable personal viewing screen and VA Programs, as defined in the SLA, with interactivity and additional features; and a perpetual, non-sublicensable, non-transferable license to make internal copies of, incorporate, and distribute the object code version of the Life Fitness Interface, as further described in the SLA.

**ANSWER:** Life Fitness admits that Netpulse granted Life Fitness Division a "non-exclusive, non-sublicensable, non-transferable – right and license" to the Netpulse Code, including the VA Programs, as defined in the SLA. Life Fitness further admits that Netpulse granted Life Fitness Division an "exclusive, non-sublicensable, non- transferable right and license" to

manufacture, sell, and distribute certain equipment as defined in the SLA. Life Fitness further

admits that Netpulse granted Life Fitness Division a perpetual, non-sublicensable, non-transferable

license to make internal copies of, incorporate, and distribute the object code version of the Life

Fitness Interface, as described in the SLA. Denied as to the remainder of this paragraph.

19.     Under the SLA, each party retained all right, title, and interest in its intellectual property. The SLA also allowed each party to use the other party's confidential information only as authorized. Upon termination, all licenses granted under the SLA were to terminate, BC was to cease manufacturing products under the agreement and within 6 months BC was to cease all marketing and offering for sale of such products. However, even after termination of the SLA, certain terms, including the confidentiality clause, survived.

**ANSWER:**     Admitted that the SLA stated that each party to the SLA retained all right,

title, and interest in its intellectual property. Denied as to the remainder of this paragraph.

20.     Under the SLA, "neither party may assign any rights or delegate any duties … without the other party's prior written consent, and any attempt to do so without that consent will be void," except in certain specifically permitted circumstances. BC was only permitted to assign the SLA to a "surviving entity in a merger or consolidation in which [BC] participates or to a purchaser of all of substantially all of [BC's] assets."

**ANSWER:**     Life Fitness admits that the SLA states "neither party may assign any rights

or delegate any duties … without the other party's prior written consent, and any attempt to do so

without that consent will be void" with certain exceptions. Life Fitness further admits that the SLA

provides "[e]ither party may assign this Agreement or delegate its duties under this Agreement to

the surviving entity in a merger or consolidation in which it participates or to a purchaser of all or

substantially all of its assets." Life Fitness denies the rest of the allegations in this paragraph.

21.     Under the VALA, Netpulse granted BC "an unlimited, perpetual, nontransferable, non-sublicensable and nonassignable license" to integrate certain VA products into BC's exercise equipment, to make certain VA courses available via BC's consoles, and to use and distribute updates to its customers. BC was not permitted to "sublicense Licensed Software [as defined in the VALA] to any third party, or otherwise cause any third party to use the Licensed Software in any way other than in [BC's] own consoles without prior written approval of Netpulse."

**ANSWER:**     Life Fitness admits that the VALA grants Life Fitness Division "an

unlimited, perpetual, nontransferable, non-sublicensable and nonassignable license." Life Fitness

further admits that the VALA provides that "Life Fitness . . . shall not sublicense Licensed Software to any third party, or otherwise cause any third party to use the Licensed Software in any way other than in its own consoles without prior written approval of Netpulse." Life Fitness denies the rest of the allegations in this paragraph.

22. The VALA also allowed each party "to use the other party's Confidential Information only as authorized." The "Confidential Information" described in the VALA included, inter alia, the Licensed Software and the parties' research and development. Upon termination, all licenses granted under the VALA were to terminate and BC was to cease all marketing, offering for sale, etc., of its products with the Licensed Software. Even if the VALA were terminated, certain terms including the confidentiality clause survived termination.

**ANSWER:** Life Fitness admits that the VALA states that it allows each party "to use the other party's Confidential Information only as authorized." Life Fitness further admits that the VALA states that "Confidential Information" includes the Licensed Software and parties' research and development. Life Fitness denies the rest of the allegations in this paragraph.

23. Under the VALA "neither party may assign any rights or delegate any duties … without the other party's prior written consent, and any attempt to do so without that consent will be void," except in certain specifically permitted circumstances not applicable here. BC was only permitted to assign the VALA to a "surviving entity in a merger or consolidation in which [BC] participates or to a purchaser of all of substantially all of [BC's] assets."

**ANSWER:** Life Fitness admits that VALA provides that "neither party may assign any rights or delegate any duties … without the other party's prior written consent, and any attempt to do so without that consent will be void" with certain exceptions. Life Fitness further admits that the VALA provides that "[e]ither party may assign this Agreement or delegate its duties under this Agreement to the surviving entity in a merger or consolidation in which it participates or to a purchaser of all or substantially all of its asset." Life Fitness denies the rest of the allegations in this paragraph.

24.     Under the ASA, Netpulse granted BC "a limited, non-exclusive, non-transferable license to use the applicable Netpulse Software solely in accordance with the instructions provided to [BC] by Netpulse and for the sole purposes of receipt of the Advertising Services [as defined in the ASA]." BC was not permitted to otherwise use the Netpulse Software, as defined in the ASA, nor to modify, reverse engineer, create derivative works, sublicense, assign, or otherwise use the Netpulse Software in any way not permitted under the ASA. Netpulse retained all rights and title to the Netpulse Software and all intellectual property rights contained therein and associated therewith.

**ANSWER:**     Life Fitness admits that the ASA granted Life Fitness Division "a limited, non-exclusive, non-transferable license to use the applicable Netpulse Software solely in accordance with the instructions provided to Life Fitness by Netpulse and for the sole purposes of receipt of the Advertising Services."   Life Fitness denies the rest of the allegations in this paragraph.

25.     The ASA also required each party to use the other party's "Confidential Information" only as authorized. The "Confidential Information" described under the ASA included, inter alia, the Advertising Service (as defined in the ASA) and the parties' research and development. Upon termination, all licenses granted under the ASA were to terminate. Even if the ASA were terminated, certain terms including the confidentiality clause survived termination.

**ANSWER:**     Life Fitness admits that the ASA stated that each party could use the other party's "Confidential Information" only as authorized.  Life Fitness further admits that the ASA stated that "Confidential Information" included the Advertising Service and the parties' research and development.  Life Fitness denies the rest of the allegations in this paragraph.

26.     Under the ASA "neither party may assign any rights or delegate any duties … without the other party's prior written consent, and any attempt to do so without that consent will be void," except in certain specifically permitted circumstances. BC was only permitted to assign the ASA to a "surviving entity in a merger or consolidation in which it participates or to a purchaser of all of substantially all of its assets."

**ANSWER:**     Life Fitness admits that ASA states that "neither party may assign any rights or delegate any duties under this Agreement without the other party's prior written consent, and any attempt to do so without that consent will be void."   Life Fitness denies the rest of the allegations in this paragraph.

27.     Netpulse performed all its obligations under the SLA, VALA, and ASA, except those that it was excused from performing. Netpulse's performance included providing BC with software, in both source code and executable code forms; providing confidential information, including confidential research, development, analysis, and testing; and providing various VA content, including VA videos.

**ANSWER:**     Life Fitness admits that Netpulse provided Life Fitness Division with software, information, and VA content.  Life Fitness denies the rest of the allegations in this paragraph.

28.     BC failed to meet its obligations under the SLA, VALA, and ASA by, inter alia, failing to enable Netpulse's advertising software on BC's consoles and taking unearned and fraudulent rebates. Effective at latest by 30 days after the filing of the California Litigation referenced in paragraph 30 below, if not earlier, the SLA, VALA, and ASA were terminated because of BC's breaches of its obligations under each of those agreements.  However, even though the SLA, VALA, and ASA were terminated, BC remained obligated to comply with many terms under the agreements, including the confidentiality obligations set forth in each agreement.

**ANSWER:**     Denied.

29.     On or about May 4, 2018, in connection with a tax-free reorganization pursuant to Section 368(a)(1)(C) of the Internal Revenue Code, Netpulse was merged into Nextpulse, LLC ("NP"), and thereupon NP became Netpulse's successor in interest.

**ANSWER:**     Life Fitness lacks information sufficient to form a belief as to the allegations of this paragraph, and therefore denies them.

30.     On November 2, 2018, NP filed a lawsuit against BC in the Superior Court of California, in and for the County of San Francisco (the "California Litigation"). The California Litigation includes causes of action for Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Fraud, and Misappropriation of Trade Secrets relating to the actions associated with the SLA, VALA, ASA, and other agreements between Netpulse and BC. BC also brought cross-claims. The California Litigation remains pending. While the SLA was found to have been novated by the 2015 Contracts in the California Litigation, that decision is not yet a final decision since the case remains pending.

**ANSWER:**     Life Fitness lacks information sufficient to form a belief as to the allegations of this paragraph, and therefore denies them.

31.     At some point, which NP believes to have been in approximately 2018, KPS engaged in negotiations to potentially acquire BC's Life Fitness Division.  Based on information and belief, NP alleges that KPS engaged in due diligence during the course of its negotiations with BC and, among other things, learned of the existence of the SLA, VALA, and ASA and evaluated those agreements as part of the due diligence process.

**ANSWER:**     The allegations of this paragraph require no response as the Court dismissed

all of the tortious interference claims in this Complaint.  Dkt. No. 89.

32.     On information and belief NP alleges that, in December of 2018, BC did an internal reorganization pursuant to which it created a wholly owned subsidiary of BC known as Life Fitness, LLC.

**ANSWER:**     Denied.

33.     NP is informed and believes, and on that basis alleges, that KPS created Lumos as an affiliate so that Lumos could be the acquiring entity of Life Fitness, LLC.  NP is informed and believes, and on that basis alleges, that at some point Lumos also became involved in the negotiations and due diligence process with BC in connection with the purchase of BC's fitness business, including its wholly owned subsidiary, Life Fitness, LLC.  As with KPS, NP is informed and believes, and on that basis alleges, that during the course of Lumos's negotiations with BC it learned, among other things, of the terms of the SLA, VALA, and ASA and evaluated those agreements as part of the due diligence process.

**ANSWER:**     The allegations of this paragraph require no response as the Court dismissed

all of the tortious interference claims in this Complaint.  Dkt. No. 89.

34.     On or about June 27, 2019, BC sold its entire fitness business (including its wholly owned subsidiary Life Fitness, LLC) to Lumos, an affiliate of KPS, a private investment firm, in an all-cash transaction for approximately $490 million.  NP is not presently aware of the details of that transaction. As a result of that transaction, for the first time Life Fitness, LLC, became a legal entity that was no longer a wholly owned subsidiary of BC.  LF has never been a party to any of the Contracts and never had any rights under any of the Contracts.

**ANSWER:**     Life Fitness admits that Life Fitness was acquired by Lumos in June 2019.

Life Fitness denies the rest of the allegations in this paragraph.

35.     During the California Litigation, BC initially denied assigning or transferring the Contracts or any rights thereunder to LF when or after LF became a separate legal entity. BC even stated under penalty of perjury that the Contracts were "not contemplated in the sale [of BC's fitness business, including Life Fitness, LLC], in part, because each of the contracts had either been novated, terminated, not-renewed, or expired." In the early part of 2022, NP learned for the first time that BC had in fact transferred to LF significant confidential information and intellectual property BC obtained from Netpulse or had rights to pursuant to the Contracts with Netpulse.

10

**ANSWER:** Life Fitness lacks information sufficient to form a belief as to the allegations of this paragraph, and therefore denies them.

36. After BC sold its fitness business, LF became a separate legal entity that was no longer owned by BC. LF was a third party that had no contractual rights under the Contracts and, pursuant to the explicit terms of each of the agreements, BC was not capable of assigning any rights under any of these agreements to LF without Netpulse's consent, which was never requested by BC nor ever given by Netpulse or NP.

**ANSWER:** Life Fitness admits it was a separate legal entity no longer owned by BC after June 2019. Life Fitness denies the rest of the allegations in this paragraph.

37. NP is informed and believes, and thereon alleges, that upon completion of the sale of LF by BC, BC transferred to LF all of the Netpulse Technology, Netpulse Confidential Information, and various forms of intellectual property Netpulse provided to BC during Netpulse's and BC's contractual relationship associated with the Contracts.

**ANSWER:** Denied.

38. NP is informed and believes, and thereon alleges, that upon completion of the sale of LF by BC on or about June 27, 2019, LF began using the Netpulse Technology and Netpulse Confidential Information, despite having no legal right to do so since BC had no right to transfer or assign any right or license to use such technology and confidential information. NP is informed and believes, and thereon alleges, that at all times relevant to this matter, LF has knowingly, deliberately, and willfully used, and threatens in the future to use, the Netpulse Technology and Netpulse Confidential Information without any right, license, or authorization to do so, in willful violation of NP's rights.

**ANSWER:** Denied.

39. NP is informed and believes, and thereon alleges, that each of the Defendants was aware of the Contracts and the terms of those Contracts, including the fact that the rights under the Contracts could not be transferred or assigned, since many of the persons employed by LF were previously employed in BC's Life Fitness division and further since these Contracts certainly should have been reviewed and evaluated by Lumos and KPS during the due diligence process associated with the acquisition of LF.

**ANSWER:** The allegations of this paragraph require no response as the Court dismissed all of the tortious interference claims in this Complaint. Dkt. No. 89.

40.     NP is informed and believes, and thereon alleges, that despite being well aware of the contractual terms prohibiting transfer or assignment and requiring confidential information to be kept confidential, Defendants intentionally interfered with the contractual relationship between Netpulse and BC, and induced BC to breach the Contracts by causing BC to illegally, and in breach of the agreements, transfer Netpulse's confidential and proprietary information to LF and/or violate the confidentiality clauses in those agreements.

**ANSWER:**     The allegations of this paragraph require no response as the Court dismissed

all of the tortious interference claims in this Complaint.  Dkt. No. 89.

41.     NP had ownership of certain trade secrets, copyrights, and other intellectual property described herein as a result of its predecessor in interest Netpulse's development of these rights and interests, while other rights were obtained as a result of acquisitions, transfers, or assignments.  In 2019, NP entered into a contract with VA and Forward Motion Partners LLC ("FMP") through which certain intellectual property was transferred to VA and/or FMP. Subsequently, in 2022, VA and FMP transferred ownership and rights to specified video content, to the extent such rights were held by VA and/or FMP, to NP. NP registered copyrights in certain VA videos and has ownership of those copyrights.

**ANSWER:**     Life Fitness lacks information sufficient to form a belief as to the allegations

of this paragraph, and therefore denies them.

42.     NP owns and has title to registered copyrights in its computer software, as set forth in Exhibit A to this Amended Complaint.

**ANSWER:**     Life Fitness lacks information sufficient to form a belief as to the allegations

of this paragraph, and therefore denies them.

43.     Based on the foregoing, NP is informed and believes, and thereon alleges, that LF has unlawfully used, reproduced, distributed, and/or made into a derivative work NP's copyrighted computer software, without authorization or right to do so, has infringed NP's valuable intellectual property rights, including its copyrighted computer software, and has threatened to, and will continue to, infringe NP's intellectual property rights unless restrained by this Court.

**ANSWER:**     Denied.

44.     NP owns and has title to registered copyrights in numerous VA videos, as set forth in Exhibit B to this Amended Complaint.

**ANSWER:**     Life Fitness lacks information sufficient to form a belief as to the allegations

of this paragraph, and therefore denies them.

45.      Based on the foregoing, NP is informed and believes, and thereon alleges, that LF has unlawfully reproduced, distributed, publicly displayed, and/or created derivative works of NP's copyrighted VA videos, without authorization or right to do so, has infringed NP's valuable intellectual property rights, including its copyrighted videos, and has threatened to, and will continue to, infringe NP's intellectual property rights unless restrained by this Court.

**ANSWER:**      Denied.

46.      At all times herein relevant, NP has complied in all respects with the Copyright Act, 17 U.S.C. Sections 101, et seq., to secure the exclusive rights and privileges in and to the copyrights in the NP computer software and videos referenced herein. The NP computer software and the videos set forth in Exhibits A and B that are the subject of this Amended Complaint consist of original works of authorship that are copyrightable under the Copyright Act. Copyrights in this computer software and these videos have been registered in full compliance with the Copyright Act, and NP has received certificates of registration from the Registrar of Copyrights for them. NP is the owner of all rights, title, and interest to said federal copyright registrations.

**ANSWER:**      Denied.

47.      LF's reproduction, distribution, public display, and/or creation of derivative works of NP's copyrighted computer software and videos is without permission or valid license. No legitimate basis exists for LF's unauthorized use of NP's copyrighted computer software and videos.

**ANSWER:**      Denied.

48.      NP seeks through this Amended Complaint to obtain preliminary and permanent injunctive relief enjoining LF, its affiliates, officers, directors, employees, agents, representatives, and all persons in active concert or participation with any of them from the unauthorized use and/or copying of NP's computer software and related documentation. NP further seeks monetary relief, including damages actually sustained by NP and/or statutory damages, and attorneys' fees and costs in this action, pursuant to 17 U.S.C. Section 502 et seq., and all other relief to which NP may be entitled.

**ANSWER:**      This paragraph contains a statement to which no response is required.  To

the extent that a response is required, Life Fitness denies the allegations set forth in this paragraph.

49.      NP is informed and believes, and thereon alleges, that LF continues to use the NP computer software and videos knowingly, deliberately, and willfully, without any right, license, or authorization to do so, and, as a result, is deliberately and willfully infringing NP's valid copyrights in said software and videos.

**ANSWER:**      Denied.

## FIRST CLAIM FOR RELIEF

### (For Copyright Infringement Against LF)

50.     NP realleges and incorporates herein, as if set forth in full, the allegations of Paragraphs 1 through 49, inclusive, of this Amended Complaint.

**ANSWER:**     Life Fitness incorporates its answers to Paragraphs 1 through 49 as though fully stated herein.

51.     In this action NP is asserting a claim against LF for copyright infringement under the federal Copyright Act, 17 U.S.C. Sections 106 et seq. NP is seeking injunctive relief, restitution, damages (actual and/or statutory, if applicable) and attorneys' fees as permitted by federal law.

**ANSWER:**     This paragraph contains a statement to which no response is required.  To the extent that an answer is required, Life Fitness denies the allegations.

52.     LF's acts constitute infringement of NP's copyrights in the NP software and videos identified in Exhibits A and B in violation of the Copyright Act, 17 U.S.C. Sections 101 et seq.

**ANSWER:**     Denied.

53.     NP is informed and believes, and thereon alleges, that LF's infringement of the copyrights in the NP computer software and videos was, and continues to be, deliberate and willful and without regard to NP's rights.

**ANSWER:**     Denied.

54.     LF's copyright infringement has caused, and will continue to cause, NP to suffer substantial injuries, loss, and damage to its proprietary and exclusive rights to, and copyrights in, the NP computer software and videos and, further, has damaged NP's business, reputation, and goodwill, diverted trade, and caused a loss of profits, all in an amount not yet ascertained but to be proven at trial.

**ANSWER:**     Denied.

55.     LF's copyright infringement and the threat of continuing infringement have caused, and will continue to cause, NP repeated and irreparable injury. It is difficult to ascertain the amount of money damages that would afford NP adequate relief at law for LF's continuing acts, and a multiplicity of judicial proceedings could be required to address the same. Accordingly, NP's remedy at law is inadequate to compensate it for the injuries threatened and inflicted by LF, and LF should be restrained and enjoined, both preliminarily and permanently, pursuant to the appropriate provisions of the Copyright Act, 17 U.S.C. Section 502.

**ANSWER:**   Denied.

## SECOND CLAIM FOR RELIEF

### (For Tortious Interference with Contractual Rights Against All Defendants)

Paragraphs 56-62 all related to the tortious interference claim.  This Court dismissed this claim in its entirety.  Dkt. 89-1.  As a result, responses are not required for Paragraphs 56-62.

## THIRD CLAIM FOR RELIEF

### (For Trade Secret Misappropriation under the Federal

### Defend Trade Secrets Act Against LF)

63.    NP realleges and incorporates herein, as if set forth in full, the allegations of Paragraphs 1 through 62, inclusive, of this Amended Complaint.

**ANSWER:**   Life Fitness incorporates its responses to Paragraphs 1 through 62 as though fully stated herein.

64.    Pursuant to the Contracts, Netpulse provided BC with certain Netpulse Technology that was confidential and subject to strict limitations on its disclosure, transfer, and use, including computer software (both object code and source code). Additionally, Netpulse provided BC with the Netpulse Confidential Information, defined above, as well as all of the confidential information identified and defined under the Contracts. The Netpulse Technology, the Netpulse Confidential Information, and the confidential information identified and defined under the Contracts are collectively referred to as the Netpulse Trade Secrets. The Netpulse Trade Secrets were provided to BC under the confidentiality terms and pursuant to other limitations in the Contracts.

**ANSWER:**   Life Fitness admits that Netpulse provided Life Fitness Division with certain Netpulse Tehcnology pursuant to the Contracts.  Life Fitness denies the rest of the allegations in this paragraph.

65.    The Netpulse Trade Secrets derive independent economic value, actual and potential, from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use. Netpulse spent many thousands of hours of employee and contractor time and related costs to develop the Netpulse Trade Secrets. If the Netpulse Trade Secrets were available to the general public or other companies in this field, it would sharply decrease the value of these trade secrets to NP.

**ANSWER:**   Denied.

66. NP and its predecessor in interest, Netpulse, have taken efforts that are reasonable under the circumstances to maintain the secrecy of the Netpulse Trade Secrets, including but not limited to requiring confidentiality clauses and strict limitations on disclosure in the agreements with BC. The Netpulse Trade Secrets relate to a product and were incorporated into a product used in, or intended for use in, interstate commerce.

**ANSWER:** Denied.

67. Each agreement alleged herein that was entered into by Netpulse and BC contained a confidentiality clause that required BC to maintain the Netpulse Trade Secrets in strict confidence. LF was familiar with these terms of the Contracts and knew that the Netpulse Trade Secrets were to be held in strict confidence.

**ANSWER:** Life Fitness admits that confidentiality clauses were included in the

contracts alleged herein. Life Fitness denies the rest of the allegations in this paragraph.

68. LF misappropriated the Netpulse Trade Secrets by taking possession custody, and control of the Netpulse Trade Secrets; using the Netpulse Trade Secrets to develop, create, and market its own software; and more easily developing, enhancing, testing, and implementing similar software, solutions, and capabilities based on information from the Netpulse Trade Secrets. BC and LF have admitted in the California Litigation that BC no longer has possession, custody, and control of the code repositories containing the computer software, the engineering notes, testing details, and other highly confidential Netpulse Trade Secrets because all of that information was transferred to LF.

**ANSWER:** Denied.

69. NP is informed and believes, and thereupon alleges, that LF has incorporated the Netpulse Trade Secrets into LF's products which it sells in interstate commerce. LF has and continues to this date to use the Netpulse Trade Secrets to allow running of software and providing of support for products, inter alia, in interstate commerce.

**ANSWER:** Denied.

70. This misappropriation by LF was made in bad faith and was willful and malicious because LF knew it had no rights to the Netpulse Trade Secrets. LF participated in the transfer of the Netpulse Trade Secrets and then used the Netpulse Trade Secrets in order to more easily succeed as a separate entity after it was divested from BC. LF's use of the Netpulse Trade Secrets was without authorization and was for LF's own commercial gain.

**ANSWER:** Denied.

71.     As a result of this misappropriation of the Netpulse Trade Secrets by LF, NP has suffered damages, and LF has been unjustly enriched and has profited. Accordingly, NP has suffered damages in an amount to be proven at trial.

**ANSWER:**     Denied.

72.     As a direct and proximate result of LF's continued misappropriation of the Netpulse Trade Secrets, NP will suffer imminent and irreparable harm. Unless enjoined by this Court, LF's acts of misappropriation will continue, and NP will continue to suffer irreparable harm. Plaintiff has no adequate remedy at law and is entitled to an injunction under 18 U.S.C. § 1836(b)(3)(A).

**ANSWER:**     Denied.

73.     On information and belief, LF's continued unauthorized use of the Netpulse Trade Secrets is willful and malicious, based on the allegations set forth above.  LF was aware it had no rights under the Contracts and could not use any of the Netpulse Trade Secrets when it was no longer part of BC.  It engaged in willful and intentional acts of misappropriation, and further attempted to mislead NP as to the true facts of the misappropriation. Plaintiff is entitled to recover enhanced damages and its reasonable attorneys' fees under 18 U.S.C. §§ 1836(b)(3).

**ANSWER:**     Denied.

## RELIEF REQUESTED

These paragraphs set forth Plaintiff's statement of relief to which no response is required. To the extent that responses to these paragraphs are required, Life Fitness denies any and all allegations set forth therein and denies that Plaintiff is entitled to any relief from Life Fitness or this Court.

## DEMAND FOR JURY TRIAL

This paragraph sets forth Plaintiff's request for a trial by jury to which no response is required.

## <u>LIFE FITNESS'S AFFIRMATIVE DEFENSES TO NEXTPULSE, LLC'S AMENDED COMPLAINT (CORRECTED)</u>

### FIRST AFFIRMATIVE DEFENSE
**(Counts I & III)**
**(Express License)**

Life Fitness is not liable for infringing the alleged copyrighted works and misappropriating the alleged trade secrets because Netpulse granted Life Fitness Division, the predecessor to Life Fitness, express licenses to said copyrights and trade secrets. Specifically, Netpulse granted Life Fitness a perpetual, express license pursuant to the Virtual Active License Agreement ("VALA") to distribute and use the allegedly copyrighted works and use the trade secrets allegedly disclosed pursuant to the VALA. The parties to the VALA intended the agreement to be between Netpulse and Life Fitness Division, the predecessor to Life Fitness, and that the rights therein inure to the benefit of the parties and their respective successors and assigns, including Life Fitness as the successor to Life Fitness Division.

Further, Netpulse granted Life Fitness Division an express license pursuant to the Advertising Services Agreement ("ASA") to use the trade secrets allegedly disclosed pursuant to the ASA. The parties to the ASA intended the contracts to be between Netpulse and Life Fitness Division, the predecessor to Life Fitness, and that the rights therein inure to the benefit of the parties and their respective successors and assigns, including Life Fitness as the successor to Life Fitness Division.

### SECOND AFFIRMATIVE DEFENSE
**(Counts I & III)**
**(Implied License)**

Life Fitness is not liable for infringing the alleged copyrighted works and misappropriating the alleged trade secrets because Netpulse granted Life Fitness Division, the predecessor to Life Fitness, implied licenses to said copyrights and trade secrets.  Specifically, Netpulse granted Life Fitness an implied license to the alleged copyrights because Life Fitness Division, the predecessor of Life Fitness, requested Netpulse to create the Licensed Software, VA Courses, and other related software pursuant to the VALA; Netpulse created the Licensed Software, VA Courses, and other related software and delivered these to Life Fitness Division and Netpulse intended Life Fitness Divion, and its successors, including Life Fitness, to copy and distribute these allegedly copyrighted works.

Further, Netpulse granted Life Fitness an implied license to the trade secrets allegedly disclosed pursuant to the VALA and ASA.  Netpulse granted Life Fitness an implied license to the trade secrets allegedly disclosed pursuant to the VALA because Life Fitness Division, the predecessor of Life Fitness, requested Netpulse to create the Licensed Software, VA Courses, and other related software pursuant to the VALA; Netpulse created the Licensed Software, VA Courses, and other related software and delivered these to Life Fitness Division and Netpulse intended Life Fitness Divion, and its successors, including Life Fitness, to use these alleged trade secrets on Life Fitness's consoles.  Similarly, Netpulse granted Life Fitness an implied license to the trade secrets allegedly disclosed pursuant to the ASA because Life Fitness Division, the predecessor of Life Fitness, requested Netpulse to create the Advertising Services and web portal, as well as other related software (collectively, "Netpulse Software"); Netpulse made and delivered the Netpulse Software to the Life Fitness Division and Netpulse intended the Life Fitness Division,

and its successors, including Life Fitness, to use the Netpulse Software on Life Fitness's Console App.

## THIRD AFFIRMATIVE DEFENSE
### (Counts I & III)
### (Implied Waiver)

Nextpulse's three-year delay in bringing its copyright infringement claim and trade secret claim indicates Nextpulse's intent to relinquish its intellectual property rights. In other words, Nextpulse's three-year delay in bringing its copyright infringement claim and the trade secret claim is so inconsistent with its intent to enforce its intellectual property rights as to induce a reasonable belief that such rights have been relinquished.

## FOURTH AFFIRMATIVE DEFENSE
### (Counts I & III)
### (Reformation)

Life Fitness is not liable for either copyright infringement or trade secret misappropriation because the VALA and ASA should be revised to express the true intention of the parties at the time they entered into these agreements, which was to grant the licenses as provided by both agreements to Life Fitness Division and to all Life Fitness Division's successors. At the time of the VALA and ASA were signed, Nextpulse and Life Fitness Division believed that Life Fitness Division, not Brunswick, was the contracting party and therefore the licensee because both contracts explicitly used "Life Fitness" as the abbreviation for the licensee and the contract negotiations were conducted between Netpulse and Life Fitness Division. Further, both section 12.7 of the VALA and section 17.7 of the ASA provided that both agreements "will bind and inure to the benefit of the parties and their respective successors and permitted assigns," further showing the parties' intent of granting the licenses provided in both VALA and ASA to the successors of the parties.

20

**FIFTH AFFIRMATIVE DEFENSE**
**(Count I)**
**(Lack of Standing - Improper Ownership)**

Nextpulse does not have standing to bring its copyright infringement claim because it is not the owner or exclusive licensee of the copyright in the VA Courses and software alleged in the Amended Complaint.

On February 28, 2019, Nextpulse and VA entered into a Stock Purchase and Sale Agreement ("SPSA") with Forward Motion Pictures LLC ("FMP"). Dkt. No. 25 at ¶41. Upon information and belief, Nextpulse and VA stated in the SPSA that all intellectual property rights related to the Virtual Active courses and software had always been owned by VA. Moreover, Section 2.15 of the SPSA assigned all right, title, and interest in all intellectual property rights related to the Virtual Active courses to FMP, including the copyrights to VA's video library and software. *Id.* at 1-3; 10. As such, when the copyright registrations and the Amended Complaint were filed, on information and belief, Nextpulse did not own the copyrights to the works alleged in the Amended Complaint.

**SIXTH AFFIRMATIVE DEFENSE**
**(Count I)**
**(Lack of Standing – No Exclusive Licensee)**

Nextpulse does not have standing to bring this copyright infringement claim because it has transferred the copyrights in an exclusive license to Brunswick.

**SEVENTH AFFIRMATIVE DEFENSE**
**(Count I)**
**(Innocent Infringement)**

Life Fitness was not aware and had no reason to believe that its acts constituted an infringement of copyright because it believed it had obtained a perpetual license to the VA Courses and software.

### EIGHTH AFFIRMATIVE DEFENSE
### (Count I)
### (No Right to Statutory Damages or Attorney's Fees)

Nextpulse is not entitled to statutory damages and attorney fees because Nextpulse did not register the copyrights prior to the date of the alleged infringement.

### NINETH AFFIRMATIVE DEFENSE
### (Count I)
### (Invalid Copyrights)

Nextpulse's alleged copyrights are invalid because it knowingly provided false information to the U.S. Copyright Office. On information and belief, Nextpulse, who only registered the alleged copyrights ten days before it filed this suit, knowingly provided false information including but not limited to ownership of the copyrights and authorship information.

### TENTH AFFIRMATIVE DEFENSE
### (Count I)
### (Unjust Enrichment)

Nextpulse was unjustly enriched by accepting and retaining the lump sum payment of $500,000 for the perpetual license under the VALA from Life Fitness Division while accusing Life Fitness, the successor of Life Fitness Division, of infringing the allegedly copyrighted work covered by the VALA. As such, Nextpulse received and is unjustly retaining benefits at the expense of Life Fitness.

### ELEVENTH AFFIRMATIVE DEFENSE
### (Count III)
### (Abandonment)

Nextpulse is not entitled to relief regarding its trade secret misappropriation claim because it abandoned its trade secrets. Both the VALA and the ASA were executed on July 30, 2015. The contracts were allegedly terminated in 2018, "if not earlier." Dkt. 66 at ¶28. However, Nextpulse

did not ask Life Fitness Division to return any of the alleged trade secrets after the alleged termination of the contracts, nor did it bring suit against Life Fitness until June 2022.

**TWELFTH AFFIRMATIVE DEFENSE**
**(Count III)**
**(Lack of Standing)**

Nextpulse does not have standing to bring a trade secret misappropriation claim because it is not the owner of the alleged trade secrets. Public records show that Netpulse, as the predecessor to Nextpulse, was acquired by eGym, a global fitness technology company, in March 2018. Based on information and belief, the alleged trade secrets were also part of the acquisition. Therefore, Nextpulse lacks standing to bring a trade secret misappropriation suit.

**THIRTEENTH AFFIRMATIVE DEFENSE**
**(Count III)**
**(Failure to Mitigate)**

Nextpulse failed and neglected to mitigate any and all damages, injury, or loss of which Nextpulse alleged in the Amended Complaint by choosing to not take steps to recover its alleged trade secrets from either Life Fitness Division or Life Fitness before filing this suit.

Dated:  May 10, 2024     Respectfully submitted,

                By: /s/ *Jason J. Keener*
                Jason J. Keener
                Joseph F. Marinelli
                Robyn M. Bowland
                Anthony Hao
                **IRWIN IP LLP**
                150 N. Wacker Dr.
                Suite 700
                Chicago, IL 60606
                (312) 667-6080
                jkeener@irwinip.com
                jmarinelli@irwinip.com
                rbowland@irwinip.com
                ahao@irwinip.com

                Counsel for Defendant *Life Fitness, LLC*

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that a copy of the foregoing document was served via ECF on May 10, 2024 upon all counsel of record.

/s/ *Gloria Rios*
Gloria Rios