**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NEXTPULSE, LLC, | Civil Action No. 1:22-CV-03239 |
| Plaintiff, | |
| v. | Judge Thomas M. Durkin |
| | Magistrate Judge Maria Valdez |
| LIFE FITNESS, LLC, | |
| Defendant. | |

### DECLARATION OF KATHRYN CURRY IN SUPPORT OF HER OBJECTIONS TO THE MAGISTRATE REPORT AND RECOMMENDATIONS DATED MARCH 7, 2025

I, Kathryn C. Curry, declare:

1.      The facts set forth herein are based on my personal knowledge and/or documents that I have personal knowledge sufficient to authenticate them, including those attached hereto, and are true and correct to the best of my personal knowledge, belief, recollection, and understanding.

2.      I am over the age of eighteen, and if asked to do so, I could competently testify to the matters set forth herein.

3.      I am a partner at GCA Law Partners LLP, counsel of record for Plaintiff Nextpulse LLC in this action as well as in the action filed in California Superior Court in and for the County of San Francisco, Case No. CGC-18-571065, entitled *Nextpulse LLC v. Brunswick Corporation* ("California Action").

4.      My application to appear pro hac vice in this action was granted on August 22, 2022.  [Doc. No. 23, 24.]

5. I have been practicing law since 1991 and am a member of the California Bar Association. I have never had any ethical violations or disciplinary issues. I have received the highest ethical ratings from my peers. I am AV rated by Martindale Hubbel with an AV Preeminent rating in Legal Ability & Ethical Standards. I was known at my prior and current firm and by my clients for my high ethical standards and high quality legal and research skills.

6. For many years, I have been on GCA's Risk Management/General Counsel Committee providing counseling and advice to the firm on various legal, ethical, and conflict issues.

7. In 2017, I was asked by my partner at GCA, E. David Marks, to assist him with a potential litigation matter for a new client, Nextpulse LLC. Mr. Marks had previously represented Thomas Proulx, the Managing Member, in other legal matters. I agreed.

8. In November 2018, we filed a complaint on behalf of Nextpulse against Brunswick Corporation in San Franciso County Superior Court.

9. In June 2022, Mr. Proulx requested that GCA and Willkie Farr & Gallagher LLP ("Willkie") represent it in a lawsuit to be filed in Illinois District Court for copyright infringement and misappropriation of trade secrets. Kimberly Donovan, another partner at GCA, took the lead in filing the complaint and opposing the various motions to dismiss. After the motions to dismiss were decided in April 2024 and the discovery stay lifted, I became the main GCA attorney for the Illinois case and worked closely with Willkie.

10. From June 2024 until late October 2024, Willkie took the lead on motions, meet and confers, and court appearances, although I was involved in all of the matters. I enjoyed working with Willkie and was impressed with them.

11. In late October 2024, Mr. Proulx told me he wanted to replace Willkie with less expensive local counsel, at least for discovery because of the significant attorney's fees being incurred. Although he (and I) were extremely pleased with Willkie, Mr. Proulx was worried the value of the case did not support the fees being incurred. Mr. Proulx told me he had talked to

Willkie, that they understood, and would help him find new local counsel.  Mr. Proulx asked that I take over main responsibilities for the case until replacement local counsel was retained.

12.     On November 18, 2024, after an abnormal mammogram, I underwent a second mammogram one, which confirmed the earlier findings. A biopsy was scheduled for December 12, 2024.

13.     After Mr. Proulx spoke with several potential local attorneys that he liked, he asked me to also speak with them about the case, which I did during the last week of November and early December 2024.  During my discussions with the attorneys, I told them about Life Fitness' motion to compel and the need for him or her to appear at the December 18, 2024 hearing.  Attached hereto as Exhibit 1 is a true and correct email I received from Mr. Bagley on December 11, 2024, after he was retained, referencing our prior discussions that he would attend the hearing on December 18, 2025.

14.     On December 3 and again on December 9, 2024, Olaf Wilson from Willkie sent an email to me and Mr. Proulx reminding us that the opposition to Life Fitness' motion to compel was due on December 11, 2024 at noon central time.  A true and correct copy of the emails from Mr. Wilson are attached hereto as Exhibit 2. Mr. Wilson also confirmed with me over the phone that I would be responsible for preparing the opposition.

15.     On Sunday, December 8, 2024, I took my eighth-grade daughter to my office so she could complete her online application for high school.  While at the office, my daughter worked in a conference room preparing three essays to be submitted with the application.  While my daughter worked on her essays, I worked on the opposition to Life Fitness' motion to compel, which I had started earlier.

16.     I used the firm's LexisNexis subscription to do my legal research for the opposition.

17.     After my daughter completed her essays, she emailed them to me so I could upload them to the application website. (A true and correct copy of her email is attached hereto as Exhibit 3.)  I read my daughter's essays and after she asked me if they were good, I remarked

that they were good, but that the people reading the essays would know she had not used ChatGPT, which was also a good thing.

18.     Having just learned that my mammogram tests were abnormal and I was scheduled to undergo a biopsy in several days, I decided to have a teaching moment with my daughter.

19.     I asked my daughter if she was aware of ChatGPT and the other AI tools.  Her daughter responded that she was, but that she did not use them and had been told by her teachers not to use them.  I then asked her to promise me that she would never use them for school even though it was going to be very tempting to do so.  To further emphasize my point and to try and scare her from using it in the future, I told my daughter how AI was often wrong and would make up facts.

20.     I was familiar with the case from several years ago wherein several attorneys were sanctioned because they used ChatGPT to write a legal brief and all the cases in the brief were fake; and when the court asked the attorneys what they did to verify the validity of the cases, they had responded that they had asked ChatGPT if the cases were valid and Chat GPT had replied that they were.

21.     I told my daughter how ChatGPT made up legal cases and showed her by making a general inquiry into ChatGPT about the Seventh Circuit's specificity requirement for trade secrets.  I used this inquiry because I had just completed that section of the opposition to the motion to compel.  ChatGPT returned a two-paragraph response.  I copied the paragraphs and put them in the middle of a page in the specificity section of my opposition to show my daughter how the ChatGPT paragraphs and cases looked legitimate in comparison to the other paragraphs and cases on that page, even though they were not.  I did not make the inquiry with the intent of using it in my brief—indeed, it was the exact opposite as I knew the cases would not be real.

22.     To further my point and in an effort to make it more relatable to my daughter (who had not seen a legal brief before), I did another ChatGPT inquiry about my grandfather--

-4-

who was the subject of one of my daughter's essays. I showed her the ChatGPT results, which contained some facts that were true, but also others that were completely false and made up.

23.     I then uploaded my daughter's essays into the on-line application. While my daughter sat with me, we answered the additional questions in the on-line application about the clubs and activities my daughter would be interested in joining for high school. I then completed the application by completing a parent essay and paying the required application fee. We then left the office. As I typically do, I left the opposition and my research open on my computer.

24.     The next day, Monday December 9, 2024, I had numerous meetings in the morning and did not return to work on the opposition to Life Fitness's motion to compel until that afternoon. I began working on the sections relating to the responses to interrogatory nos. 2 and 22 and had completely forgotten about the ChatGPT inserts in the section for interrogatory number one.

25.     Because Nextpulse's opposition had to be filed by noon Central Time, which was 9 a.m. Pacific Time, I had arranged with my paralegal to file the opposition on December 10, 2024 to make sure it would be timely filed.

26.     On December 10, 2024, I completed the draft opposition to the motion to compel in the early evening and sent it to Mr. Proulx for review and comment. After receiving his comments and edits, I prepared my declaration and finalized the response. Prior to sending the documents to my paralegal to file, I decided to do another review. While I was correcting a citation to a quotation in the section regarding interrogatory number 1, I remembered the ChatGPT inserts and removed them thinking at the time, "Oh my god, thank god I remembered. That would have been horrible."

27.     I then emailed the opposition and my declaration to my paralegal to efile. Unknowingly, however, I sent the wrong version of the brief that did not include her last-minute changes removing the non-existent cases.

28.     Willkie was not involved in the preparation of the response brief. Aside from the reminder emails to me and Mr. Proulx on December 3 and December 9, 2024, Willkie had no

other communications with Ms. Curry (or anyone else) regarding the response--before or after it was filed. Contrary to Judge Valdez' findings, Willkie did not notify me that the opposition contained any errors or non-existent cases.

29. On December 12, 2024, Olaf Wilson from Willkie sent an email to counsel for Life Fitness (copying me) to advise that Mark Bagley would be serving as local counsel moving forward and asked if Life Fitness would oppose their motion to withdraw. That was the last communication from Willkie that I received about the case. A true and correct copy of the email is attached hereto as Exhibit 4.

30. After the opposition had been filed, Nextpulse retained Mr. Bagley as its new local counsel on December 11, 2024. I contacted Mr. Bagley that day to begin assisting him to prepare for the hearing on December 18, 2024.

31. On Monday, December 16, 2024, Mr. Bagley sent me an email stating he could not find two cases cited in the response brief and asked her to double-check the citations and/or send him copies of the cases. A true and correct copy of the email is attached hereto as Exhibit 5. Upon reading it, my heart sank and I hoped that I had simply sent Mr. Bagley the incorrect version of the opposition. I immediately checked the ECF docket to see what had been filed, and to my utter dismay, I discovered that the wrong version of the brief had been filed and that it was completely my fault as I had sent the wrong version of the brief to my paralegal. I briefly told Mr. Bagley what had happened, apologized to him for the errors, and immediately began preparing a Notice of Errata to file with the Court and serve on defense counsel in order to let them know about the two non-existent cases cited in the brief and the quotation citation error.

32. I did not ask Mr. Bagley what to do since he had just been brought into the case and it was my fault and my responsibility to notify the court and opposing counsel. I did, however, send him a draft Notice of Errata to review before she filed with the Court. A true and correct copy of my email to Mr. Bagley is attached hereto as Exhibit 6. The Notice of Errata was filed within several hours after I received Mr. Bagley's email.

33.     I honestly and in good faith believed that filing a Notice of Errata was the correct, proper, and ethical action I was supposed to take to alert the court, opposing counsel, and the public as to the errors and the non-existent cases in the opposition brief.  I was not attempting to hide what had happened or was trying to be evasive or deceitful in any way—I was trying to do the opposite and take full accountability.

34.     That afternoon, December 16, 2024, I called Mr. Proulx and explained in full detail what had happened.

35.     As previously planned, Mr. Bagley appeared at the hearing on Life Fitness' Motion to Compel for Nextpulse on December 18, 2024; and I did not attend.  I was not trying to avoid the court by not being there.

36.     On December 19, 2024, a week after the biopsy was performed, I was notified by my doctor that I had breast cancer and that he had scheduled me to attend a health care team meeting (the surgeon, oncologist, and social workers) on December 26, 2024 (the first available appointment) so that they could explain next steps, treatment, and support options.  At the December 26, 2024 meeting, the surgeon told me the biopsy pathology report was encouraging (the cancer was localized, in a small area, and caught very early).  He believed I could be successfully treated with surgery (a lumpectomy) and radiation, but they would need the pathology report from the lumpectomy before deciding on the actual course of treatment.  The lumpectomy was scheduled for January 2, 2025.  I told my doctor that I had been ordered by a judge to be in Chicago on January 8, 2025, and asked if I would be able to attend that hearing.  My doctor told me no, because there would be a two-week recovery time after the surgery, and I should not travel.

37.     The next day, on Friday December 27, 2024, I sent an email to opposing counsel telling them I could not personally appear at the January 8, 2025 hearing because of private medical reasons and I asked if they would object if a asked to discuss the reasons with the judge privately (*ex parte*).  Opposing counsel replied that they did not object, but asked to be present If there were  any discussions regarding the motion to compel. (A true and correct copy of the

email is attached hereto as Exhibit 7.)  Thereafter, I sent an email to the Court advising that I could not appear at the hearing in person due to medical reasons and requested to permission to speak ex parte with the judge those reasons.  A true and correct copy of my email is attached hereto as Exhibit 8.

38.     On Monday December 30, 2024, Magistrate Valdez issued a Minute Order ordering me to file under seal and without service to opposing counsel a statement as to the reasons I could not attend the hearing set for January 8, 2025, along with an estimate as to dates I may be available to appear in person with all sensitive information redacted. I sent the requested declaration to Judge Valdez that day.

39.     In my declaration, I explained my medical situation and although I could not appear personally at the January 8, 2025 hearing, I could appear remotely on that date or anytime thereafter.  If required to personally appear, I would not be able to provide dates until after her oncologist received the pathology report after the upcoming January 2, 2025 lumpectomy.  A true and correct copy of the declaration I sent to Judge Valdez is attached hereto as Exhibit 9.

40.     On January 13, 2025, my surgeon called me to tell me that he had received the pathology results and they were very encouraging, but that I needed to discuss further treatment options with the oncologist.  A video appointment was scheduled for January 27, 2025 (the earliest appointment).

41.     I met with my oncologist, Dr. Lee, on January 27, 2025, over video.  She recommended three weeks of radiation treatments (Monday through Friday) to begin the week of February 3, 2025.  I asked Dr. Lee if I could postpone the radiation treatments until the following week (February 10, 2025), because I had been ordered by a judge to be in Chicago on February 5, 2025 and it had already been previously delayed.  Dr. Lee agreed my treatment could be postponed and the radiation treatments were scheduled to begin on Monday, February 10.  (See, reference to Chicago in Exhibit 11.)

42.     On January 29, 2025, I notified the Court that I was available to personally appear on February 5, 2025; and a Minute Order was issued that day.

-8-

43.     I made travel and childcare arrangements so I could be in Chicago on February 5, 2025.

44.     On February 4, 2025, as I was about to head to the airport, the Court issued a minute order striking the February 5, 2025, hearing and resetting it for February 12, 2025.

45.     I contacted Dr. Lee and told her my trip had been postponed a week and asked if I could start radiation treatments the week of February 18, 2025. She agreed.

46.     I personally appeared before the Court on February 12 , 2025 and explained what had happened and answered the Court's questions.  I answered all questions truthfully and was trying to be straightforward with my answers and was not, as the Court later surmised, trying to be vague or evasive with any of my answers.  Attached hereto as Exhibit 10 is a copy of the transcript of the February 12, 2025 hearing.

47.     Attached hereto as Exhibit 11 are true and correct copies of my medical records with redactions, which show the dates and treatments I have described herein.

48.     I did not generate any ChatGPT results with the intention of using them as part of my legal argument in the opposition to the motion to compel.  I only used ChatGPT as  a tool to teach my daughter.

49.     I disagree with Judge Valdez' conclusion that the two ChatGPT cases were foundational to my legal argument.  A review of the brief shows that the two ChatGPT generated cases are located in the middle of the argument—where I placed them so my daughter could see and compare to the other statements in the brief.  If I had believed the cases were real and had intended to use them in the brief, I would have placed them at the beginning of the specificity argument and before the Georgia case, not after.

50.     Judge Valdez concluded it was not credible for me to have inserted them into the brief in order to make my point to my daughter.  I agree in hindsight that that was indeed a very poor decision, but I told the Court the truth.  The brief was open on my computer. I copied and put the ChatGPT results into my brief to visibly show my 13-year old daughter how the ChatGPT statements and cases looked very real in comparison to the other cases in my brief.

51.     I also disagree with Judge Valdez' finding that my trade secret specificity legal arguments were supported only by a 2007 case from the District of Georgia.  In my opposition, I expressly cited to, and discussed, several Seventh Circuit and Illinois District court cases in support of my position.  (See, Opposition at pp. 6-8.)  I also relied on a factually similar case from the Northern District of Illinois, *AutoMed Techs, Inc. v. Eller*, 160 F.Supp.2d 915, 920-21 (N.D. Ill. 2001), which specifically involved source code as the trade secrets.  I also distinguished the cases cited by Life Fitness in its motion. (Opp pp. 6-7, and fns. 2 and 3.)

52.     I also disagree with Judge Valdez conclusions that I acted dishonestly, was not forthcoming, and was not fully candid with the Court.  I was.  The Court kept asking why I did not file a corrected brief. I truthfully answered that I did not believe that I was authorized to do that and so I did not consider that was even an option I could take.

53.     Judge Valdez' conclusion that I sat on the information for several days before notifying the Court and opposing counsel is not correct.  I filed the Notice of Errata within hours after I first learned of my error.  The first time that I was notified about the non-existent cases in the brief was when Mr. Bagley sent me an email on December 16, 2024. (Exhibit 6.)  When put on the spot at the hearing on February 12, 2025, I could not remember off the top of my head the exact number of days from when the brief was filed on December 10, 2024 to when Mr. Bagley sent me his email on December 16, 2024.

54.     Also contrary to Judge Valdez's supposition, the change in local counsel was simply coincidental and had nothing to do with the opposition that I filed.  Nextpulse had been interviewing new local counsel for weeks.  Willkie was not involved in preparing the opposition, it was my sole responsibility, and no one at Willkie planned, intended, or was expected to argue the motion at the hearing on December 18, 2025.  No one at Willkie ever contacted me about the brief or any errors contained therein.  As I previously stated herein, before the opposition was even filed, Nextpulse intended for new local counsel to attend the hearing on the motion to compel.

-10-

55.     I fully understand the severity of the issue and I take full responsibility for the presence of the non-existent cases in Nextpulse's opposition to the motion to compel.  It was my fault, and my mistakes fell below the requisite standard of care for attorneys.  But I did tell the truth as to what happened--it was an accident--and I immediately notified the court and opposing counsel of the errors after I discovered them.  I also did not try to deflect or blame anyone else for my actions.  I, therefore, respectfully request that the monetary sanctions be reduced, the Magistrate's findings that I acted was outrageously and dishonestly not be adopted by this Court; and that the matter not be referred to the Executive Committee for review.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 21st day of March 2025, in Mountain View, California.

 /s/  Kathryn C. Curry
            Kathryn C. Curry

# EXHIBIT 1

**Kathryn Curry**

| | |
|---|---|
| **From:** | Mark <mark@tolpinlaw.com> |
| **Sent:** | Wednesday, December 11, 2024 1:53 PM |
| **To:** | Tom Proulx |
| **Cc:** | Kathryn Curry; Barbara Proulx |
| **Subject:** | RE: Life Fitness case |

Tom,

Thank you. I have received confirmation from our end that we received the retainer amount.

Kathy, the administrative details are set on our end, so please let me know how you would like me to start getting up to speed on the case and/or taking on specific tasks to help you out. I seem to recall that there is an in-person hearing on a motion to compel next week, so I assume that is one of the first things we will be working on. I look forward to hearing from you.

Best regards,
Mark

Mark R. Bagley
**Tolpin & Partners, PC**
30 N. LaSalle Street, Suite 1510
Chicago, IL 60602
Phone: 312-698-8971
Fax: 312-803-9602
e-mail: mark@tolpinlaw.com
www.tolpinlaw.com

Confidentiality Notice

This e-mail or the documents accompanying this e-mail contain information which may be confidential or privileged and exempt from disclosure under applicable law. The information is intended to be for the use of the individual or entity named on this transmission. If you are not the intended recipient, be aware that any copying, distribution or use of the content of this information without authorization is prohibited. If you have received this e-mail in error, please notify us immediately so that we can take action to correct the problem.

**Tom Proulx** | Chairman| **Nextpulse, LLC**

e: tomp.nextpulse@gmail.com | p: 650-561-3900

https://www.linkedin.com/in/proulxthomas
Audriix's latest single is out: *I Do*

# EXHIBIT 2

## Kathryn Curry

| | |
|---|---|
| **From:** | Wilson, Olaf <OWilson@willkie.com> |
| **Sent:** | Monday, December 9, 2024 11:22 AM |
| **To:** | Kathryn Curry; Tom Proulx; bbproulx@gmail.com |
| **Cc:** | Grayson, Barbara; Horton, Sara Tonnies; Babbitt, Michael G.; Tina Ernst |
| **Subject:** | RE: Nextpulse v. Life Fitness - Upcoming Deadlines |

Got it, thanks Kathy.

Olaf


**Olaf Wilson**
**Willkie Farr & Gallagher LLP**
300 North LaSalle Dr. | Chicago, IL 60654-3406
Direct: +1 312 728 9096 | Fax: +1 312 728 9199
owilson@willkie.com | vCard | www.willkie.com bio

**From:** Kathryn Curry <kcurry@gcalaw.com>
**Sent:** Monday, December 9, 2024 1:16 PM
**To:** Wilson, Olaf <OWilson@willkie.com>; Tom Proulx <tomp.nextpulse@gmail.com>; bbproulx@gmail.com
**Cc:** Grayson, Barbara <BGrayson@willkie.com>; Horton, Sara Tonnies <SHorton@willkie.com>; Babbitt, Michael G. <MBabbitt@willkie.com>; Tina Ernst <ternst@gcalaw.com>
**Subject:** RE: Nextpulse v. Life Fitness - Upcoming Deadlines

**\*\*\* EXTERNAL EMAIL \*\*\***

Hi Olaf,

We will take care of the filing on due on Wednesday.  Our plan is to file tomorrow evening.

I will attend the telephonic status conference with Judge Durkin this Friday, December 13.

We will not need for a visitor's office on December 18.

Thanks!

Kathy

_____



**Kathryn C. Curry,** *Partner*
2570 W. El Camino Real, Suite 400
Mountain View, California 94040

Main:    (650) 428-3900
Direct:  (650) 237-7236
Fax:      (650) 428-3901

1

Email:  kcurry@gcalaw.com

This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is strictly prohibited.  If you are not the intended recipient please contact the sender and delete all copies.

---

**From:** Wilson, Olaf <OWilson@willkie.com>
**Sent:** Monday, December 9, 2024 11:11 AM
**To:** Tom Proulx <tomp.nextpulse@gmail.com>; bbproulx@gmail.com; Kathryn Curry <kcurry@gcalaw.com>
**Cc:** Grayson, Barbara <BGrayson@willkie.com>; Horton, Sara Tonnies <SHorton@willkie.com>; Babbitt, Michael G. <MBabbitt@willkie.com>
**Subject:** RE: Nextpulse v. Life Fitness - Upcoming Deadlines

All:

Following up with a reminder on this week's deadline to file an opposition to Defendant's Motion to Compel, which is due by **noon central on Wednesday**.  Kathy, please let us know if you would like us to have our docketing department on standby to file.  And if you would like a visitor's office for the hearing on December 18, we are happy to book one for you.

Thanks,
Olaf


**Olaf Wilson**
**Willkie Farr & Gallagher LLP**
300 North LaSalle Dr. | Chicago, IL 60654-3406
Direct: +1 312 728 9096 | Fax: +1 312 728 9199
owilson@willkie.com | vCard | www.willkie.com bio

---

**From:** Wilson, Olaf
**Sent:** Tuesday, December 3, 2024 8:42 PM
**To:** Tom Proulx <tomp.nextpulse@gmail.com>; bbproulx@gmail.com; Kathryn Curry <kcurry@gcalaw.com>
**Cc:** Grayson, Barbara <BGrayson@willkie.com>; Horton, Sara Tonnies <SHorton@willkie.com>; Babbitt, Michael G. <MBabbitt@willkie.com>
**Subject:** Nextpulse v. Life Fitness - Upcoming Deadlines

All:

Just a reminder about the upcoming deadlines over the next few weeks.

- **December 11**: Opposition to Defendant's Motion to Compel (**must be filed by noon CT**);
- **December 18**: In-Person Hearing before Magistrate Judge Valdez on Defendant's Motion to Compel at 10:00 am CT;
- **December 19**: Response to Defendant's Second Set of Interrogatories Due;
- **January 15**: In-Person Hearing before Magistrate Judge Valdez "for settlement conference setting" at 10:00 am CT.

Kathy, please let us know if you would like to have our docketing department on standby to help file the opposition to the motion to compel next week.  We can get that lined up.  Please also know if you'd like a visitors office for the December 18 hearing.

Let us know if you have any questions. Thanks,

Olaf

---

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

---

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

# EXHIBIT 3

**Kathryn Curry**

| | |
|---|---|
| **From:** | Fang Xi Cheng <fangxic29@stu.svintl.org> |
| **Sent:** | Sunday, December 8, 2024 1:27 PM |
| **To:** | Kathryn Curry |
| **Subject:** | ESSAYS |
| **Attachments:** | SFHS - Essay 1.docx; SFHS - Essay 2.docx; SFHS - Essay 3.docx |

ok

# EXHIBIT 4

**Kathryn Curry**

| | |
|---|---|
| **From:** | Wilson, Olaf <OWilson@willkie.com> |
| **Sent:** | Thursday, December 12, 2024 2:30 PM |
| **To:** | Joseph Marinelli |
| **Cc:** | Kathryn Curry; Horton, Sara Tonnies; Babbitt, Michael G.; Silvertrust, Skyler J.; NextPulse v. Life Fitness |
| **Subject:** | Nextpulse Case |

Joe:

As you may have noticed, Mr. Mark Bagley has entered an appearance on behalf of Nextpulse. Mark will be serving as local counsel moving forward, so the Willkie attorneys (Sara, Mike, and Skyler) will be filing motions to withdraw from the case. The other Nextpulse attorneys, including Kathy Curry, will also remain in the case. Under Judge Durkin's standing order, all motions must state whether there is any objection to a motion. Do you have any objection to the Willkie attorneys' motions to withdraw?

Thanks,
Olaf

**Olaf Wilson**
**Willkie Farr & Gallagher LLP**
300 North LaSalle Dr. | Chicago, IL 60654-3406
Direct: +1 312 728 9096 | Fax: +1 312 728 9199
owilson@willkie.com | vCard | www.willkie.com bio

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

# EXHIBIT 5

**Kathryn Curry**

| | |
|---|---|
| **From:** | Mark <mark@tolpinlaw.com> |
| **Sent:** | Monday, December 16, 2024 11:19 AM |
| **To:** | Kathryn Curry |
| **Subject:** | RE: Nextpulse v. Life Fitness - MTC Hearing on Wednesday |

Hi again,

In preparation for talking later, I was wondering if you could check on two things from your brief. I was unable to find (though Westlaw or Google) two cases discussed in it. They are Harris v. Springfield 634 F.3d 622 (7th Cir. 2011), and Trafalgar Power, Inc. v. Gessner 455 F.3d 354 (7th Cir. 2006). Could you double-check those citations and/or send me copies of those cases? Thanks.

Mark

Mark R. Bagley
**Tolpin & Partners, PC**
30 N. LaSalle Street, Suite 1510
Chicago, IL 60602
Phone: 312-698-8971
Fax: 312-803-9602
e-mail: mark@tolpinlaw.com
www.tolpinlaw.com

Confidentiality Notice

This e-mail or the documents accompanying this e-mail contain information which may be confidential or privileged and exempt from disclosure under applicable law. The information is intended to be for the use of the individual or entity named on this transmission. If you are not the intended recipient, be aware that any copying, distribution or use of the content of this information without authorization is prohibited. If you have received this e-mail in error, please notify us immediately so that we can take action to correct the problem.

**From:** Kathryn Curry <kcurry@gcalaw.com>
**Sent:** Monday, December 16, 2024 1:13 PM
**To:** Mark <mark@tolpinlaw.com>
**Subject:** RE: Nextpulse v. Life Fitness - MTC Hearing on Wednesday

Yes, that works. Thanks!

Kathy

**From:** Mark <mark@tolpinlaw.com>
**Sent:** Monday, December 16, 2024 11:06 AM
**To:** Kathryn Curry <kcurry@gcalaw.com>
**Subject:** RE: Nextpulse v. Life Fitness - MTC Hearing on Wednesday

Hi Kathy,

I am going through the case law discussed in the briefs now. I would hope we could have an initial meeting later today, say around 2:00 pm Pacific time. Would that work for you?

Mark

Mark R. Bagley
**Tolpin & Partners, PC**
30 N. LaSalle Street, Suite 1510
Chicago, IL 60602
Phone: 312-698-8971
Fax: 312-803-9602
e-mail: mark@tolpinlaw.com
www.tolpinlaw.com

<u>Confidentiality Notice</u>

This e-mail or the documents accompanying this e-mail contain information which may be confidential or privileged and exempt from disclosure under applicable law.  The information is intended to be for the use of the individual or entity named on this transmission.  If you are not the intended recipient, be aware that any copying, distribution or use of the content of this information without authorization is prohibited.  If you have received this e-mail in error, please notify us immediately so that we can take action to correct the problem.

**From:** Kathryn Curry <kcurry@gcalaw.com>
**Sent:** Monday, December 16, 2024 1:03 PM
**To:** Mark <mark@tolpinlaw.com>
**Subject:** Nextpulse v. Life Fitness - MTC Hearing on Wednesday

Hi Mark,

Please let me know when you would like to have a call to prepare for the hearing on Wednesday.

Kathy

_____



**Kathryn C. Curry,** *Partner*
2570 W. El Camino Real, Suite 400
Mountain View, California 94040
Main:     (650) 428-3900
Direct:   (650) 237-7236
Fax:      (650) 428-3901
Email:    kcurry@gcalaw.com

This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is strictly prohibited.  If you are not the intended recipient please contact the sender and delete all copies.

# EXHIBIT 6

**Kathryn Curry**

**From:** Mark <mark@tolpinlaw.com>
**Sent:** Monday, December 16, 2024 12:54 PM
**To:** Kathryn Curry
**Subject:** RE: Nextpulse v. Life Fitness - MTC Hearing on Wednesday

Kathy,

One non-substantive change for the errata – Brett has not appeared for this case, so his name probably should not appear in the signature block at this point.

Substantively, I would not have any suggested changes, assuming that there are not any other errors in the brief. At this point, the other thing I've seen is that I could not find the quote on pg. 6 of "clearly refer[s] to tangible trade secret material" in either of the two cases cited immediately after it.

Best regards,
Mark

Mark R. Bagley
**Tolpin & Partners, PC**
30 N. LaSalle Street, Suite 1510
Chicago, IL 60602
Phone: 312-698-8971
Fax: 312-803-9602
e-mail: mark@tolpinlaw.com
www.tolpinlaw.com

Confidentiality Notice

This e-mail or the documents accompanying this e-mail contain information which may be confidential or privileged and exempt from disclosure under applicable law. The information is intended to be for the use of the individual or entity named on this transmission. If you are not the intended recipient, be aware that any copying, distribution or use of the content of this information without authorization is prohibited. If you have received this e-mail in error, please notify us immediately so that we can take action to correct the problem.

**From:** Kathryn Curry <kcurry@gcalaw.com>
**Sent:** Monday, December 16, 2024 2:43 PM
**To:** Mark <mark@tolpinlaw.com>
**Subject:** RE: Nextpulse v. Life Fitness - MTC Hearing on Wednesday

Mark,

Here is the errata. Please let me know if you have any suggested changes or comments.

When final, I will file right away.

Thanks.

Kathy

_____



**Kathryn C. Curry,** *Partner*
2570 W. El Camino Real, Suite 400
Mountain View, California 94040

Main:   (650) 428-3900
Direct: (650) 237-7236
Fax:     (650) 428-3901
Email:   kcurry@gcalaw.com

This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is strictly prohibited.  If you are not the intended recipient please contact the sender and delete all copies.

---

**From:** Mark <mark@tolpinlaw.com>
**Sent:** Monday, December 16, 2024 11:19 AM
**To:** Kathryn Curry <kcurry@gcalaw.com>
**Subject:** RE: Nextpulse v. Life Fitness - MTC Hearing on Wednesday

Hi again,

In preparation for talking later, I was wondering if you could check on two things from your brief.  I was unable to find (though Westlaw or Google) two cases discussed in it.  They are Harris v. Springfield 634 F.3d 622 (7th Cir. 2011), and Trafalgar Power, Inc. v. Gessner 455 F.3d 354 (7th Cir. 2006).  Could you double-check those citations and/or send me copies of those cases?  Thanks.

Mark

Mark R. Bagley
**Tolpin & Partners, PC**
30 N. LaSalle Street, Suite 1510
Chicago, IL 60602
Phone: 312-698-8971
Fax: 312-803-9602
e-mail: mark@tolpinlaw.com
www.tolpinlaw.com

Confidentiality Notice

This e-mail or the documents accompanying this e-mail contain information which may be confidential or privileged and exempt from disclosure under applicable law.  The information is intended to be for the use of the individual or entity named on this transmission.  If you are not the intended recipient, be aware that any copying, distribution or use of the content of this information without authorization is prohibited.  If you have received this e-mail in error, please notify us immediately so that we can take action to correct the problem.

---

**From:** Kathryn Curry <kcurry@gcalaw.com>
**Sent:** Monday, December 16, 2024 1:13 PM
**To:** Mark <mark@tolpinlaw.com>
**Subject:** RE: Nextpulse v. Life Fitness - MTC Hearing on Wednesday

Yes, that works. Thanks!

Kathy

**From:** Mark <mark@tolpinlaw.com>
**Sent:** Monday, December 16, 2024 11:06 AM
**To:** Kathryn Curry <kcurry@gcalaw.com>
**Subject:** RE: Nextpulse v. Life Fitness - MTC Hearing on Wednesday

Hi Kathy,

I am going through the case law discussed in the briefs now. I would hope we could have an initial meeting later today, say around 2:00 pm Pacific time. Would that work for you?

Mark

Mark R. Bagley
**Tolpin & Partners, PC**
30 N. LaSalle Street, Suite 1510
Chicago, IL 60602
Phone: 312-698-8971
Fax: 312-803-9602
e-mail: mark@tolpinlaw.com
www.tolpinlaw.com

<u>Confidentiality Notice</u>

This e-mail or the documents accompanying this e-mail contain information which may be confidential or privileged and exempt from disclosure under applicable law. The information is intended to be for the use of the individual or entity named on this transmission. If you are not the intended recipient, be aware that any copying, distribution or use of the content of this information without authorization is prohibited. If you have received this e-mail in error, please notify us immediately so that we can take action to correct the problem.

**From:** Kathryn Curry <kcurry@gcalaw.com>
**Sent:** Monday, December 16, 2024 1:03 PM
**To:** Mark <mark@tolpinlaw.com>
**Subject:** Nextpulse v. Life Fitness - MTC Hearing on Wednesday

Hi Mark,

Please let me know when you would like to have a call to prepare for the hearing on Wednesday.

Kathy

_____



**Kathryn C. Curry,** *Partner*
2570 W. El Camino Real, Suite 400
Mountain View, California 94040
Main:    (650) 428-3900
Direct:  (650) 237-7236
Fax:     (650) 428-3901

Email:   kcurry@gcalaw.com

This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is strictly prohibited.  If you are not the intended recipient please contact the sender and delete all copies.

# EXHIBIT 7

**Kathryn Curry**

---

| | |
|---|---|
| **From:** | Victoria Hanson <vhanson@irwinip.com> |
| **Sent:** | Friday, December 27, 2024 11:30 AM |
| **To:** | Kathryn Curry |
| **Cc:** | Mark; Joseph Marinelli |
| **Subject:** | RE: Ex Parte Call with Judge Valdez |

Kathryn,

We are sorry to hear about your unexpected medical issue. We do not object to a personal call with Judge Valdez to discuss your medical information but do not agree to any discussion regarding the pending motion or the issues underlining the order. If Judge Valdez raises either of these items in your discussion, we ask that you respectfully request that we join the call.

Best,

Victoria Hanson | Associate

**Irwin IP LLP**
Intellectual Property Litigation
150 N. Wacker Drive | Suite 700 | Chicago, IL 60606
Direct 312.667.6196 | Mobile 559.862.5184
vhanson@irwinip.com | www.irwinip.com

Confidentiality Notice: This e-mail transmission and any attachments may contain confidential or legally privileged information. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please immediately notify the sender by reply e-mail and delete the message from your system.

---

**From:** Kathryn Curry <kcurry@gcalaw.com>
**Sent:** Friday, December 27, 2024 11:58 AM
**To:** Joseph Marinelli <jmarinelli@irwinip.com>; Victoria Hanson <vhanson@irwinip.com>
**Cc:** Mark <mark@tolpinlaw.com>
**Subject:** Ex Parte Call with Judge Valdez

//EXTERNAL//
Joe and Victoria,

An unexpected medical issue has arisen that prevents me from traveling to Chicago for the January 8, 2025 hearing.

Because I was ordered to personally appear, I need to notify Judge Valdez right away and would like to send an email to the courtroom deputy today asking for an call with the Judge on Monday or Tuesday, if possible,  to explain.

I will copy you on the email to the Courtroom deputy, but would request that my call with the judge be alone since it involves my personal medical information.

Please let me know if you object.

Best,

Kathryn

_____



**Kathryn C. Curry,** *Partner*
2570 W. El Camino Real, Suite 400
Mountain View, California 94040
Main:    (650) 428-3900
Direct:  (650) 237-7236
Fax:      (650) 428-3901
Email:   kcurry@gcalaw.com

This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is strictly prohibited.  If you are not the intended recipient please contact the sender and delete all copies.

# EXHIBIT 8

**Kathryn Curry**

**From:** Kathryn Curry
**Sent:** Friday, December 27, 2024 11:54 AM
**To:** Lisa Provine
**Cc:** Joseph Marinelli; Victoria Hanson; Mark
**Subject:** Nextpulse v. Life Fitness Case No. 1:22-cv-03239 Ex Parte Call Request

Hello Ms. Provine,

Pursuant to Judge Valdez' minute order (ECF # 152), I was ordered to appear personally before the Court on January 8, 2025 at 10:00 a.m.

Unfortunately, an unexpected medical issue has arisen that precludes me from traveling to Chicago. I would, therefore, like to request an ex parte call with the Court to explain why I cannot attend in person and why I am unable to provide alternative dates to be in Chicago at this time. Because it involves a medical issue, I would request that I be alone on the call with chambers.

I have notified opposing counsel of the request and they are copied on this email. They do not object to the ex parte call with the Court to explain why I cannot attend in person. I did not intend to discuss the pending motion or the issues underlining the minute order during the call. Should either of these issues be raised, opposing counsel request to be joined on the call.

Thank you.

Kathryn Curry
Attorney for Plaintiff Nextpulse LLC



**Kathryn C. Curry,** *Partner*
2570 W. El Camino Real, Suite 400
Mountain View, California 94040
Main:     (650) 428-3900
Direct:  (650) 237-7236
Fax:      (650) 428-3901
Email:   kcurry@gcalaw.com

This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is strictly prohibited. If you are not the intended recipient please contact the sender and delete all copies.

# EXHIBIT 9

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

NEXTPULSE, LLC,

              Plaintiff,

v.

LIFE FITNESS, LLC,

              Defendant.

Civil Action No. 1:22-CV-03239

Judge Thomas M. Durkin
Magistrate Judge Maria Valdez

*FILED UNDER SEAL PURSUANT TO 12/20/24 MINUTE ORDER (DOCKET # 154)*

**STATEMENT OF KATHRYN C. CURRY REGARDING**
**INABILITY TO PERSONALLY APPEAR**
**AT THE JANUARY 8, 2025 HEARING**

I, Kathryn C. Curry, declare as follows:

1.      I am submitting this statement pursuant to the Court's Minute Order dated December 30, 2024 (Docket # 154).

2.      I reside in Sunnyvale, California and have been admitted *Pro Hac Vice* to appear in this case on behalf of Plaintiff Nextpulse LLC.

3.      Pursuant to the Court's minute order (ECF # 152), I am ordered to appear personally before the Court on January 8, 2025 at 10:00 a.m.

4.      Unfortunately, as set forth herein, an unexpected issue has arisen that precludes me from traveling to Chicago on January 8, 2024.

5.      After two abnormal mammograms, I underwent a breast biopsy on December 12, 2024.

6.      I was notified via phone call on December 19, 2024, that I have breast cancer.

7.      I met with my health care provider's breast cancer care team (an oncologist, surgeon, social worker, and physician's assistant) on December 26, 2024, the first available appointment.

8.      At the December 26, 2024, meeting, my oncologist told me the pathology report was very encouraging (the cancer is localized in a small area, was caught very early, at stage 0) and believes the cancer can be successfully treated with surgery and radiation.

9.      My surgery is scheduled for Thursday, January 2, 2024.

10.     The recovery time is one to two weeks. I will be restricted from lifting anything with my left arm or lifting my left arm over my shoulder until the site is fully healed. My doctors told me I cannot travel to Chicago on January 8, 2025.

11.     After surgery, I will receive daily radiation treatments for four to five weeks. The duration of the radiation treatments, however, will not be conclusively determined until after my oncologist receives the pathology report from the surgery.

-1-

Thus, I cannot provide the Court with dates that I will be able to travel to Chicago until those treatments are set.

12.     I was told the daily radiation treatments will be short in duration and should not impact me physically (other than leaving a rash or sunburn type pain). The treatments, however, must be done on consecutive days, which prohibits me from traveling to Chicago.

13.     Although I am unable to travel to Chicago because of the post-surgery restrictions and radiation appointments, I believe I can appear telephonically or remotely for the hearing on January 8, 2025, or anytime thereafter.

14.     If required to appear personally, I can provide the Court with dates that I can travel after my oncologist receives the surgery pathology report and determines the final post-surgery treatment protocol.

15.     I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

16.     Executed on December 30, 2024, in Mountain View, California.

_____/s/ Kathryn C. Curry_____
Kathryn C. Curry

# EXHIBIT 10

1  **TRANSCRIBED FROM DIGITAL RECORDING**

2                  IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
3                          EASTERN DIVISION

4  NEXTPULSE, LLC,                        )
                                          ) Case No. 22 C 3239
5              Plaintiff,                 )
                                          )
6              vs.                        )
                                          )
7  LIFE FITNESS, LLC,                     ) Chicago, Illinois
                                          ) February 12, 2025
8              Defendant.                 ) 10:05 A.M.

9          TRANSCRIPT OF PROCEEDINGS – Status and Motion
        BEFORE THE HONORABLE MARIA VALDEZ, Magistrate Judge
10

   APPEARANCES:
11

   For the Plaintiff:        GCA LAW PARTNERS LLP
12                           2570 West El Camino Real
                             Suite 400
13                           Mountain View, California  94040
                             BY:  MS. KATHRYN CECILIA CURRY
14

                             TOLPIN & PARTNERS, PC
15                           30 North LaSalle Street
                             Suite 1510
16                           Chicago, Illinois  60602
                             BY:  MR. MARK R. BAGLEY
17

   For the Defendant:        IRWIN IP LLP
18                           150 North Wacker Drive
                             Suite 400
19                           Chicago, Illinois  60606
                             BY:  MR. JASON J. KEENER
20

21
                        PAMELA S. WARREN, CSR, RPR
22                  Official Court Reporter - Retired
                       23869 N. High Ridge Drive
23                   Lake Zurich, Illinois   60047
                             312.823.0001
24

25  NOTE:  Please notify of correct speaker identification.

2

```
 1        (Proceedings held in open court:)
 2             THE CLERK:  22 C 3239, Nextpulse, LLC versus Life
 3   Fitness, LLC, status and motion hearing.
 4             THE COURT:  Let's get appearances, please.
 5             MS. CURRY:  Good morning, your Honor.  Kathryn Curry
 6   for plaintiff Nextpulse, LLC.
 7             MR. BAGLEY:  And Mark Bagley on behalf of the
 8   plaintiff Nextpulse.
 9             THE COURT:  Mr. Bagley, you're local counsel?
10             MR. BAGLEY:  Yes.
11             THE COURT:  Okay.
12             MR. KEENER:  Good morning, your Honor.  Jason Keener
13   of Irwin IP for defendant Life Fitness.
14             THE COURT:  Mr. Bagley, you don't have an appearance
15   yet; is that correct?
16             MR. BAGLEY:  I believe I do have an appearance.
17             THE COURT:  You do?  Okay.
18             MR. BAGLEY:  It is not -- I am local counsel.  It is
19   more of, I would say, local counsel slash co-counsel situation
20   at this point.
21             THE COURT:  I just wanted to make sure.  Local counsel
22   doesn't necessarily have to have an appearance on file --
23             MR. BAGLEY:  All right.
24             THE COURT:  -- so I wasn't sure where you stood.
25             All right.  We have two matters.  But the first matter
```

3

1   I do want to deal with is the rule to show cause.

2           Ms. Curry, first of all, I appreciate that you are

3   here.  You were willing to be here last week.

4           MS. CURRY:  Judge --

5           THE COURT:  The Court had an emergency, and I'm glad

6   that you are here today.

7           I will also say that I was very concerned about the

8   filing that was made that is the subject of this rule to show

9   cause.  And then I was even more concerned that the response

10  was just to merely file an errata sheet.

11          Tell me what was going on.  Like why did you believe

12  an errata sheet would be appropriate?

13          MS. CURRY:  Yes, your Honor.  Because I thought that

14  was the only method for getting it to the Court.  I knew that

15  because I had filed it publicly, because the document was a

16  publicly filed document that had an egregious error in it, that

17  it had to be a publicly filed document to let the world know

18  that there was an error in that brief.

19          So that was the only procedure that I thought -- I

20  knew I could not just simply file a corrected or an amended

21  brief, and to file the errata to get it to the Court's

22  attention immediately and to have it in the public record and

23  to have it, you know, to the world to know that there was that

24  error in that brief.  So I thought I was doing the correct

25  thing.  And I apologize if -- that the Court felt it was not.

1          THE COURT:  Well, the trouble was that you never

2    sought to withdraw the offensive pleading and you never sought

3    to file any -- because according to the errata sheet, the

4    pleading that you filed was the wrong version.  So I presume

5    there was a right version that you never filed.

6          MS. CURRY:  Correct.

7          THE COURT:  And you made that choice not to file

8    anything in substitution or request leave to do so.

9          MS. CURRY:  No.  I do believe that I was authorized to

10   do that.

11         THE COURT:  All right.  Explain to me how it came

12   about.  What process or procedures were in place at your law

13   firm that allowed such an offensive pleading to be filed?

14         MS. CURRY:  Yes, your -- your Honor, if I could go

15   back, if you don't mind, if I could explain how it happened.

16         THE COURT:  Yes.

17         MS. CURRY:  So I was working in -- I took my -- my

18   daughter is in the eighth grade.  She's applying to high

19   school.  And I took her in on a Sunday to my office so that she

20   could do her -- she had to write essays for her high school

21   application.  And while she was in the office working on those

22   essays, I was working on this responsive brief.

23         When my daughter was done with her essays -- how it

24   worked was she emailed it in to me.  She came in my office, we

25   opened them, and we looked at them.  And she said, mom, what do

1  you think?  And I said to her, I said, you're an eighth grader.

2  I thought the essays were -- were good.  I said, no one will

3  ever accuse you of any ChatGPT.  And I said that's a great

4  thing.

5          And then I took it as a teaching moment for my

6  daughter.  And I sat her down and I said this is a crazy time

7  with AI and you're going to be tempted in high school or

8  college to use these AI tools.  And I said don't.  And so I

9  showed her.

10          And I know that if you plug into ChatGPT it gives you

11  fake cases.  So I was doing the specificity.  I plugged in,

12  give me the general rule for the Seventh Circuit.  It popped

13  up.  I showed her.  I copied it and put it in my brief to show

14  her, look, this looks real and they are fake.

15          And then she looked at me and I said -- and then one

16  of her essays was about my grandfather.  And so I said, look,

17  let's put him in so you can see.  Again, the law kind of went

18  over her head.  And so half of it came out true and the other

19  half just blatant false, incorrect statements.

20          So then my daughter was like, all right, all right.

21  So we finished up.

22          So then I pulled up the application, the online

23  application, put in her essays.  I also had to fill out

24  some -- we had to fill out some questions together about what

25  she would be interested in.  I had to do a parent essay, had to

1    make the payment, then submitted it.  This was on a Sunday.  So

2    then we left.

3         I totally forgot about what I had done.  And so the

4    next day in the morning I wasn't working on the brief.  In the

5    afternoon I was.  Went on to other things.

6         Anyway, before I sent it off to the client for

7    review -- we got revisions.  And when I got it back and I

8    thought it was final and I -- I was doing it all myself to get

9    it prepped and ready to go to the paralegal to do -- run a

10   table and then to file -- I noticed -- I remembered the cases.

11   I was going back through it.  I was like, oh, my God, thank

12   God, how horrible would that have been.

13        So then I also made other changes because there is a

14   quote and I had relied more on the Ninth Circuit because it had

15   the most stringent specificity requirement, and so I added

16   those changes.  Finalized.

17        I thought I had saved it, the new brief, saved as

18   final.  The -- and then, when I went to email, we -- my

19   paralegal worked remotely.  I emailed her what I thought was

20   that final brief but it wasn't.  It was -- it was the wrong

21   one.

22        I had no idea that that had happened until co-counsel,

23   who was going to argue the motion, calls me, I don't know five

24   days later and says, I can't find two cases.  And my heart

25   sunk.  And I thought, please, God, let me have sent him the

1    brief in that -- and that that wasn't what was filed with the

2    Court.

3          So I did my research and, unfortunately, it was

4    exactly what I had filed with the Court was sent to him.

5          So then I did the errata right away because I knew I

6    had to let counsel and the Court know.

7          THE COURT:  Did you confer with Mr. Bagley, who, you

8    know, is a local lawyer, as to what the proper procedure would

9    have been in our district to deal with this kind of issue?

10         MS. CURRY:  I did not.  I just told him briefly what

11   had happened and that I was scrambling to work on it.  And then

12   I notified him that I was filing the -- I was so concerned

13   about getting it to your Honor and to your clerks and to

14   opposing counsel because it was only a few days before the

15   hearing.

16         THE COURT:  Here's my concern with what you have just

17   said.  I can understand in concept your argument that the

18   Seventh Circuit framework cases were totally made up because

19   you were using artificial intelligence, other than Westlaw or

20   Lexis.

21         But there were real -- other real problems with your

22   brief.  You were citing incorrectly.  You were citing for the

23   wrong propositions.  So it wasn't just this Seventh Circuit

24   framework concept.

25         For example, on page 4 you cited to the Deere case,

1  which is a real case.  But you failed to include the cite, that

2  the case was from the Southern District of Indiana, which is

3  obviously of importance because it affects the Court's review

4  of whether that case, you know, should have, you know, strong

5  precedent or strong, you know, I should really look at that

6  case.  It comes from our sister court.

7       On page 5, you quote IDX.  You use a short citation

8  that it had never been previously cited.

9       On page 5, one of the only real cases that were cited

10  was an argument from the Northern District of Georgia and it

11  was from 2007.  And you cite this case for the definition of

12  reasonable particularity.

13       And then there were generally sloppy citations

14  throughout.  There was the Von Holdt case, Northern District of

15  Illinois, June 1st.  And you actually, you know, included the

16  parenthetical that is included in Westlaw or Lexis about view

17  options.  So that was just clearly a cut-and-paste job.

18       And there were other citations to non-binding

19  authority that made no sense.

20       So it was not just what you say was the AI work which

21  was the, quote, Seventh Circuit framework two cases, it was a

22  mess all around.

23       I don't understand how that happens with AI.

24       MS. CURRY:  No, that wasn't -- that stuff was my own

25  research.  That was the only AI part.

9

1        The rest was all my Lexis research.  I was doing the

2   research myself.  I was trying to find any cases that discuss

3   code, software code.  And like, for Deere, cited Deere because

4   it was a general proposition of that, you know, motion to

5   compel.  It was just a federal rule is that either it is, you

6   know, incomplete, evasive, or failed to answer, and Deere was

7   arguing that it was a complete answer.

8        Again I understand and I take to heart what the Court

9   has said.  I see that I absolutely should have done a lot more

10  in explaining what I was doing, you know, why I was citing out

11  of state.  And that is inexplicable and I should have done

12  that.  I just -- in my head it all made sense as to why I was

13  doing that.  And I needed to put forth and explain my thinking.

14  And I apologize.

15       THE COURT:  What I don't understand is why you would

16  not have, if this was a draft that was a nonsense draft, then

17  asked leave of the Court to file your real response.  Because

18  there was a real motion pending and as you -- and as a result

19  of what you did file, it was basically an unopposed motion

20  because of what you filed was -- was entirely inappropriate.

21       So I don't understand why you didn't try to rectify it

22  with what you say -- was there a final draft that was ready to

23  go and you just asked -- you know, just accidentally pulled

24  a -- this draft that you filed?

25       MS. CURRY:  Yeah.  But that the draft is -- I mean,

1    I -- it is -- aside from the changes that were in the errata,

2    the other -- I -- I believed and obviously, you know, it was

3    not good enough, but I believe that these cases did support the

4    positions that I was trying to set -- set forth.

5            THE COURT:  It was also, just the citations were just

6    awful.  I mean, I don't -- I know that you have been probably

7    out of law school for more than a few years and you understand

8    the importance of proper citation format.

9            MS. CURRY:  Yes.  I use Lexis and I understood the

10   Court had said that.  These were the cites.  And I have all of

11   the cases.  And I used the cites that were -- that came up

12   for -- for Lexis.

13           THE COURT:  You know, Bluebook citation would tell you

14   that if you are citing to a Southern District of Indiana case,

15   you have to include that in the citation.

16           MS. CURRY:  Sorry, your Honor.  Yes, your Honor.

17           THE COURT:  And even Bluebook would tell you not to

18   include -- not to cut and paste and have a view option in

19   there.  It is -- it is just inconceivable to me that this would

20   have happened.

21           Let me ask you this, before the errata sheet was

22   filed, did you contact opposing counsel to let them know that

23   you intended to file an errata sheet?

24           MS. CURRY:  No, I did not, your Honor.

25           THE COURT:  And why didn't you do that?

1        MS. CURRY:  Because I was scrambling in that -- I
2  didn't want to even waste the time doing that.  I was
3  scrambling putting together the errata sheet to get it to the
4  Court.
5        THE COURT:  I mean, the fact that this was your own
6  work -- and I understand your argument that you were trying to
7  teach your daughter a lesson, it is a lesson that has come back
8  to haunt you.
9        MS. CURRY:  Absolutely.
10        THE COURT:  I'm going to take it under advisement as
11  to what sanction I believe should be imposed.
12        You know, the courts are very, very concerned about
13  the use of AI in pleadings, even -- we expect double checking
14  and triple checking.  Apparently nobody checks your work.
15        And did your paralegal do any case citation check,
16  anything like that?
17        MS. CURRY:  No, your Honor.
18        THE COURT:  That's not his or her role in your firm?
19        MS. CURRY:  No, your Honor.
20        THE COURT:  All right.  I'll take it under advisement.
21        Do you have anything to say before I close this one
22  out?
23        MR. KEENER:  Your Honor, no, I don't think there is
24  anything I need to say on this topic.
25        THE COURT:  All right.

1        All right.  Let's go on to the present motion that is

2   before the Court.  This is the defendant's motion to dismiss as

3   a sanction for the response.  This is related somewhat to what

4   we just dealt with because I granted relief to the defense

5   because I thought that the plaintiff's response was so

6   deficient that it was in effect an unopposed motion.

7         All right.  Who wants to address this?

8        MR. KEENER:  If I could, your Honor.  My motion.

9   We're here because Nextpulse has still not identified its trade

10   secrets with specificity in violation of the Court's order.

11   This case is almost three years old.  Discovery closes in less

12   than two months, and we still don't know what the trade secrets

13   are.

14        The entirety of the responses, we have given you the

15   source code.  The entirety of the source code is our trade

16   secret, including each and every algorithm contained within

17   that source code.  That should be enough.

18        I have five points in reply, your Honor.

19        THE COURT:  Go ahead.

20        MR. KEENER:  First, this gave us no new information we

21   didn't have since the beginning of the case.  We knew their

22   advertising source code was alleged trade secrets.  We are in

23   the same spot we were at the beginning of this case.  Nothing

24   has changed since the original interrogatory response

25   substantively.

1          Second, there is no reasonable interpretation of our

2     prior motion that it was seeking access to the source code.

3     This Court had already granted that access when it entered the

4     confidentiality order in this case with specific source code

5     inspection protocol.  We had that access already.  Again,

6     nothing new was provided.

7          Third, this response is simply a veiled attempt for

8     the Court to reconsider its order in the prior motion.  Maybe

9     these are the arguments in cases they wanted to rely upon or

10    should have relied upon in the first motion, but they shouldn't

11    be allowed to do it here.  They have not met any grounds for

12    this Court to reconsider its motion and they have not asked

13    this Court to reconsider its order.

14         The order was clear, you were not inviting them to do

15    a do-over and file a different response brief.  You granted our

16    motion in full saying, the source code alone as a trade secret

17    was not enough specificity.

18         Fourth --

19         THE COURT:  Go ahead.

20         MR. KEENER:  Fourth, they are wrong on the merits.

21    The guiding case law is the NEXT case where they must disclose

22    the underlying merits and not leave it at vague generalities of

23    the functions.  That case relies on the binding Seventh Circuit

24    IDX case which again says you have to separate the wheat from

25    the chaff (unintelligible) to say what are the general building

1    blocks and exclude those from your trade secrets.

2           This case is eerily similar to the Compuware case.

3    And I always hesitate to read from the case and -- from the

4    Court, but the facts are so close to the Compuware case.

5           And in that case, Compuware dragged its feet with

6    regard to identifying its trade secrets.  Compuware initially

7    asserted that each of the software programs in and of

8    themselves were trade secrets; same as this case.  But of

9    course this is not the law.  The Court cites cases.

10          The Court informed Compuware and it directed Compuware

11   to specifically identify its trade secrets.  The Court warned

12   Compuware that to the extent your client is aware as to

13   specific trade secrets that were misappropriated, you have to

14   identify it.  And that under Rule 11 you can't just come out

15   and say, since our theory is that the other side didn't have

16   access to pro- -- to our right to access our programs, our

17   programs themselves are trade secrets.  You have got to be more

18   specific.

19          In response, Compuware submitted a supplemental

20   response which failed to adequately identify trade secrets.

21   Instead the supplemental response was the various functions of

22   the software programs.  Exactly what Nextpulse did here.

23          The Court goes on.  Clearly this submission did not

24   satisfy the Court's order requiring Compuware to specifically

25   identify trade secrets.  Given the state of the law, the

1    Court's warning and Compuware's supplemental response, the
2    Court can conclude only that either:  One, Compuware was merely
3    attempting to at least superficially comply with this Court's
4    order; or two, Compuware was not aware of what its trade
5    secrets were.  Neither reason justifies Compuware's failure to
6    comply with this Court's discovery order.
7          And in that case, what Compuware then had to do was
8    not only produce all of its source code, but also provide
9    detailed appendixes that the Court says were lengthy and
10   detailed cross referencing the source code identifying in
11   detail what the alleged trade secrets were.
12         THE COURT:  Is that what you're looking for here?
13         MR. KEENER:  Yes.
14         THE COURT:  I was trying to figure out what -- what
15   would you believe would be an appropriate response when we ask
16   for --
17         MR. KEENER:  Sure.  And that's actually my fifth point
18   here.  In their supplemental response they say their trade
19   secrets is the source code, the compiled code, and the
20   algorithm present in each and every file that they identified.
21         And in their response, they gave away the game.  On
22   page 5 of their response they say, well, when we get later in
23   this case, the expert of the case will, quote, likely be able
24   to identify numerous, quote, common building blocks that
25   (unintelligible) is an independent trade secret

1    (unintelligible).

2         That's what we're trying to see.  What is the chaff,

3    the generic building block, and what are actual -- the trade

4    secrets in this case.

5         As but one example, one of their source code files

6    they identify is AdServiceListener.  And they say what it does

7    is it listens and is triggered when all the ads are loaded.

8         I don't know whether that is an independent trade

9    secret, AdServiceListener; or two, whether the concept of

10   having something that listens and is triggered when all ads are

11   loaded is an alleged trade secret; or three, there is some

12   unique way it listens that other programs don't do.  They found

13   a unique algorithm, a way of listening, that's more efficient

14   or somehow a trade secret and provides value; or number four,

15   where this listener is in the program compared to where other

16   programs normally listen, that's the trade secret; or number

17   five, certain specific lines in that code are not common

18   programming lines, the generic building blocks they admit are

19   present, and that those are what the trade secret is.

20        The problem is I need to prepare the case for defense

21   and compare their code to our HALO advertising system.  Beyond

22   doing a literal line for line code to see if the entire code is

23   present -- there is going to be some similarities because they

24   are both advertising systems.

25        I don't know whether any of those similarities,

1    listening to see if all ads are filed, are trade secrets or not

2    in this case, so I don't know whether to take discovery on

3    whether, well, how common is that code?  Is that generally

4    known to programmers?  Is that something independently

5    developed?  I don't know.

6           So we need a detailed list, like we asked in the

7    original motion of here were the things we're going to argue

8    are independent trade secrets.  And if your programs uses

9    those, we're going to let you misappropriate those.  And that

10   narrows the case to focus on what we need to take discovery on

11   in the very short amount of time we have left.

12          THE COURT:  Mr. Bagley.

13          MR. BAGLEY:  Well, counsel has said a number of

14   things.  I'm not sure how to respond to all of them in the

15   correct order.

16          One thing that stuck out to me was that counsel just

17   characterized this Court's order as saying what -- that the

18   source code -- source code was not enough.  I don't believe

19   that the Court ever said that.  The -- as I read the initial

20   brief, they are -- excuse me -- defendant's initial motion to

21   compel, they were asking for information beyond the names of

22   the 129 files that we had identified, which was what was

23   identified at the time.  And the Court said, yes.

24          THE COURT:  What more has been identified?

25          MR. BAGLEY:  Excuse me?

1       THE COURT:  Tell me what more have you identified than
2   was originally identified that caused them to file their first
3   motion.
4       MR. BAGLEY:  Right.  So what their first motion does
5   not mention and what I was going to argue at the time was that
6   they have the code.  This is --
7       THE COURT:  So my question remains:  What more have
8   you identified?  So there was an original motion.  There was an
9   unopposed motion.  You identified the source code already.  The
10  motion that gets filed.  They want more.
11      What more have you identified?
12      MR. BAGLEY:  Well, they produced the source code.
13  There is a difference between --
14      THE COURT:  Okay.
15      MR. BAGLEY:  -- identifying it and --
16      THE COURT:  And they produced --
17      MR. BAGLEY:  -- source code.
18      THE COURT:  Anything else, other than the production
19  of the source code that you had previously identified?
20      MR. BAGLEY:  I believe, yes.  I think there are things
21  that were -- we added some more description to it, telling what
22  I believe what the source code is.
23      One of the things that -- added a number of things.
24  But the second supplemental response on January 31st said, you
25  know, the trade secrets are the source code itself contained in

1    the files that are listed and described above, which were

2    produced.  The compiled versions of that code and this -- and

3    to me this is the key, the algorithms within each source code

4    that implement the functions the code is designed to

5    accomplish.

6         To me that's the key.  Now maybe we could have put it

7    a little more elegantly.  But that tells you that what the

8    trade secret is the how, right?

9         So we have 129 files.  Each file it averages on about

10   170 lines of code.  And within that, there are specific ways of

11   doing things.  Specific algorithms in fact.

12        This is another point I wanted to make.  I think

13   counsel and I have different concept of what an algorithm is.

14   In talking to my client, an algorithm is simply a series of

15   instructions for how to do something.  And that's what is in

16   each of those 129 files.  It is instructions of how to do

17   certain things with data in which put together, altogether will

18   accomplish the end goal.

19        THE COURT:  So you're saying they have the source

20   code.  They have the compiled versions.  And they have all the

21   algorithms.

22        MR. BAGLEY:  The algorithms are --

23        THE COURT:  Just do they have three of those?

24        MR. BAGLEY:  They have all of those things.

25        THE COURT:  Okay.  Do you have all of those things?

1    MR. KEENER:  What he is saying is the algorithms are

2    just the source code.  We don't have, oh, we have an algorithm

3    for listening to all ads, it is Steps 1, 2, and 3, and we think

4    that is an independent trade secret.  We don't have that.

5        What they said, well, we'll give you all the source

6    code for the ad listening things.  So figure out what the

7    algorithm is.  And whether that's a trade secret or not, they

8    are not going to tell us whether that's an independent trade

9    secret or just the whole thing.  They are saying the experts

10   will figure that out later what our trade secrets are.

11       And I don't know how to take discovery on that.  What

12   things do I need to take discovery on, whether they are well

13   known in the industry, whether they are easily to be made

14   known, whether they are things that we independently developed,

15   whether they came from our other third parties.  I don't know

16   until I figure out what specific algorithms they're claiming

17   are independent trade secrets.

18       MR. BAGLEY:  I would claim everything, all the

19   algorithms in there are the trade secrets.  There is nothing in

20   the 129 files to which we are saying is not a trade secret.

21       THE COURT:  Is there anything else that you're going

22   to be identifying as a trade secret apart from what you say you

23   have already provided to them?

24       MR. BAGLEY:  No.

25       THE COURT:  There are no other trade secrets within

1   anything?

2          MR. BAGLEY:  To my knowledge, no.  We have defined it

3   as these -- the code in these 129 files.

4          MR. KEENER:  Your Honor, the problem is then in the

5   response brief, again, they admit within that there is lots of

6   common building blocks --

7          THE COURT:  Yes.

8          MR. KEENER:  -- which are steps and algorithms that

9   they admit are not trade secrets.  They need to identify what

10  are the not trade secrets throughout the code, the tens of

11  thousands of lines of code --

12         THE COURT:  Mr. Bagley --

13         MR. KEENER:  -- so we can focus on those --

14         THE COURT:  -- do you have any information on the,

15  quote, common building blocks that you reference?  Do you have

16  anything to respond, to provide them in response?

17         MR. BAGLEY:  To identify specifically what they are, I

18  do not at this point.

19         THE COURT:  So you don't have that.

20         MR. BAGLEY:  (Unintelligible) -- no.  No, we have

21  talked to our expert and he said that, yes, this is -- or who

22  actually has done this -- you know, this kind of code

23  comparison a number of times, including in the California case

24  that's related to this one, and he said, yes, we are willing to

25  do that.  We, of course, don't count those very small things.

1    When they talk about basic building blocks, I would

2    actually ask counsel to remember -- to talk about some of the

3    details that we talked about in the -- in our conversation.

4    Because it was things like, well, how do you order, you know,

5    items within a set?  I mean, that is a kind of a basic.  I

6    mean, there could be some basic ways to do it.  And that's the

7    kind of thing that all software programmers would know how to

8    do.

9        But the secret is not how do you order items within

10    the set, it is -- you know, that's one small part of it.  It is

11    the next level up of extraction, which is what are the ultimate

12    things you're doing with that.  And then specifically -- again,

13    I come back to the how.  The trade secret is the how.

14        THE COURT:  And do you have any -- or do you -- are

15    you in possession of any information on the extractions?

16        MR. BAGLEY:  Well --

17        THE COURT:  Or are you just relying on the, you know,

18    you got the algorithms, we're going to later on build -- build

19    something from that --

20        MR. BAGLEY:  Well --

21        THE COURT:  -- and specifically identify for you what

22    you have done wrong or how you have violated our mark?

23        But do you have anything like that now?  You're saying

24    the experts are going to decipher that.  You have not, as

25    lawyers, made any allegations specifically that you're aware of

1    to say it is Building Block A versus Building Block B.

2            MR. BAGLEY:  We have not.  No, we have not --

3            THE COURT:  You have not.

4            MR. BAGLEY:  -- (unintelligible) that out.  And I

5    suppose because I have not seen anywhere in the case law that

6    would require us to do that.

7            THE COURT:  Okay.

8            MR. BAGLEY:  Some of the other cases just said, okay,

9    you know, source code can be trade secret.  And so we're saying

10   that this is the source code.  It is our trade secret.

11           MR. KEENER:  And, your Honor, one more wrinkle to this

12   is, as this Court knows, there is a related litigation that

13   happened in California for over five years.  This trade secret

14   of the advertising code was one of the issues in that case.

15           They were weeks away from going to trial on their

16   trade secret misappropriation claim.  They must have

17   crystallized what they were going to argue are the actual trade

18   secrets.  Their expert had spent time in that case.

19           They are just hiding the ball so I can't take

20   discovery on what they're actually going to come at trial and

21   say, well, jury, we found a new way to listen to ads or we

22   found a new way to do this.  And that's valuable.  And they got

23   a head start because --

24           THE COURT:  Here --

25           MR. KEENER:  -- I don't know that.

1    THE COURT:  Stop.  Because one of the concerns, you

2  know, for everyone is if the attorneys, through their

3  communication with their clients, are aware that that has

4  already been done and yet are saying to me that they have no

5  information on that, that is a huge statement for an attorney

6  to make.

7    MR. KEENER:  Well, and maybe that's why the --

8    THE COURT:  Because, obviously, one does not want to,

9  you know, perpetrate any fraud upon the Court.

10    So I will ask you again to go back, make a

11  determination, if there is nothing that your client has that is

12  related to these building blocks that we have been discussing

13  or specific issues under the algorithm, then I'd like to know

14  that.

15    If there is something that they are aware of, they

16  need to tell you clearly.

17    And you need to do your job as an officer of the Court

18  of conveying that information.  Because you're telling me

19  you're not aware of anything right now.  I mean, obviously I

20  can't compel you to do something you haven't -- you don't have

21  any information on.

22    But counsel is saying you should.  Your client should

23  have some information on this.

24    So what do you want to do?  I mean, I'm going to take

25  this under advisement and issue a ruling.  But if you don't

 1    want to provide me any further information, that's up to you.

 2            MR. BAGLEY:  I don't want to say that I don't want to

 3    provide you with further information.  I personally don't think

 4    I can at this point because of when I -- if there was some

 5    knowledge about what happened in the California case --

 6            THE COURT:  It is what your client is aware of.  It

 7    is --

 8            MR. BAGLEY:  Okay.

 9            THE COURT:  You know, the knowledge is your client's

10    knowledge, not your knowledge.  You're getting your knowledge

11    from your client.

12            Obviously, though, if you have some contrary

13    information, you have got to do your, you know, ethical

14    responsibility as a result.

15            But your client is the one that answers the

16    interrogatories.  Your client is the one that produces

17    documents.  Your client is the one that's going to be deposed.

18    So it is your client's knowledge that is at issue, correct?

19    When you do an interrogatory response, you don't just say, oh,

20    I am going to answer for the client and not talk to the client.

21    It is the client's knowledge that is at issue.

22            MR. BAGLEY:  It is absolutely the client's knowledge

23    that is at issue.  And the client's position is the code is the

24    trade secrets.

25            THE COURT:  I understand.

1      MR. BAGLEY:  Now the client is not an attorney.

2      THE COURT:  But he is now saying that your client,

3  your other litigation, is aware of further information other

4  than what you're telling me that is in -- at issue here -- that

5  there is nothing further other than the source code and what

6  derives from that.

7      MR. BAGLEY:  But do -- you still appear.  You can --

8  you can --

9      MS. CURRY:  Sorry, your Honor.  I was involved in this

10  California.

11      THE COURT:  Yes.

12      MS. CURRY:  If I could just add to that statement.

13  Our different (unintelligible) sorry.  The code at issue here

14  is a subset of smaller -- I mean, the code at issue here is a

15  larger set of the subset that was in the California case.

16      We did have an expert review.  The expert found

17  copying of code.  He had printouts that he would then be able

18  to do this analysis of Life Fitness in the California action

19  (unintelligible) came from receiving those printouts.

20      So, no, at this time we do not have that information.

21      If they would like us to provide those printouts --

22      MR. BAGLEY:  I believe we asked for those in our

23  discovery requests.

24      MR. KEENER:  Two points, your Honor.  First is the

25  whole idea is for them to identify their trade secrets before

1    the comparison.  What they want is do the comparison first and

2    say, anything similar, that is our trade secret.  That is exact

3    backwards to all the case law.  So that's why (unintelligible)

4    not supposed to do that.

5          Second, their particular limitation to the source code

6    inspection of what they were supposed to do in the California

7    case, similar to what is in place in this case, how many pages

8    they can get.  And they asked for, I think it was, like six,

9    eight hundred pages.  We want all -- they say, no, no, you were

10   supposed to get ten pages continuous, 50-page total.  Pick the

11   pages you want and they refused to do that.

12         While that was all pending, the Court out there

13   dis- -- granted summary judgment to Brunswick saying Nextpulse

14   doesn't own any of these alleged trade secrets.  Plus, none of

15   the alleged trade secrets you have identified have any

16   independent economic value, and dismissed that whole claim.

17   Now that's not binding here because Nextpulse settled shortly

18   thereafter.

19         But that's what we're trying to get is what are the

20   actual trade secrets before you do the comparison, before you

21   try and find, oh, whatever is similar is these are our trade

22   secret.  That was our crown jewel.  Find -- define those words.

23         THE COURT:  Let me be clear, nothing in California is

24   binding here.

25         MR. KEENER:  Right.

```
 1              THE COURT:  So whether there was a determination on
 2    the merits.  This is not binding precedent, right?  It is
 3    persuasive authority.
 4              MR. KEENER:  It could have been a collateral estoppel
 5    issue.
 6              THE COURT:  Sure.
 7              MR. KEENER:  Right.
 8              THE COURT:  May have been.
 9              MR. KEENER:  Correct.
10              THE COURT:  But apart from that --
11              MR. KEENER:  Right.
12              THE COURT:  -- what I am -- I am gearing in on is
13    there is a responsibility of a party in answering
14    interrogatories based on all the information they have
15    available to them.  That's what I am gearing in on.
16              And if you don't have anything -- if you're going to
17    say, I'm not going to file anything or I'll file something and
18    it says, there is not any further information, then I will take
19    that and I will then make my ruling.
20              But I want to make sure that you understand in
21    20 years on the bench the only time I have ever, ever
22    sanctioned lawyers is when they have not done their due
23    diligence in talking to their client about what is in the
24    client's possession and control.
25              So just be careful about this.  That's all I'm saying.
```

1   I'm not throwing a -- you know, down a gauntlet on you.  I just

2   want to warn you that I take it very seriously that if it comes

3   out that your client was aware of, you know, further building

4   blocks that were specifically identified relating to the issues

5   in this case, then it is going to be a concern that will be

6   raised.

7               MR. BAGLEY:  I understand.

8               THE COURT:  Okay.  So you have week a file something

9   more with me if you want.

10              And a week to respond to what was filed.

11              And then I will rule.

12              MR. BAGLEY:  Thank you, your Honor.

13              THE COURT:  All right.  That concludes my morning's

14  matters.  Thank you very much.

15         (Which concluded the proceedings.)

16                      CERTIFICATE

17              I certify that the foregoing is a correct transcript

18  from the digital recording of proceedings in the above-entitled

19  matter to the best of my ability, given the limitation of using

20  a digital-recording system.

21

22  */s/Pamela S. Warren*                    February 12, 2025
    Official Court Reporter - Retired              Date
23  United States District Court
    Northern District of Illinois
24  Eastern Division

25

**FULLY REDACTED EXHIBIT 11 -**

**PROVISIONALLY FILED UNDER**

**SEAL PURSUANT TO L.R. 26.2**